UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-00090-PAB-MJW

LEHMAN BROTHERS HOLDINGS INC.,

Plaintiff,

v.

UNIVERSAL AMERICAN MORTGAGE COMPANY, LLC,

Defendant.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Lehman Brothers Holdings, Inc. ("LBHI"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rules of Practice of the United States District Court for the District of Colorado-Civil Rule 56.1, and PAB Civ. Practice Standards III.F.3.a, respectfully moves this Court for summary judgment against Defendant Universal American Mortgage Company LLC ("UAMC") as to liability on the loan at issue in this action and states as follows:

## **INTRODUCTION**

This is a straightforward breach of contract action arising from the sale of a defective or non-conforming loan by a loan originator to an investor. Specifically, LBHI's assignor, Lehman Brothers Bank, FSB ("LBB")[1] and UAMC, both sophisticated commercial parties, entered into a contract—a loan purchase agreement with an incorporated Seller's Guide (the "contract" or "Agreement")—under which UAMC, a loan originator, sold residential mortgage loans to LBB. A function of the Agreement was

---
[1] LBB is now known as Aurora Commercial Corp, successor entity to Aurora Bank, FSB, f/k/a Lehman Brothers Bank. SMF ¶ 1.

1

that the risk of borrower misrepresentations or underwriting defects was allocated to the loan originator, UAMC. Accordingly, UAMC represented and warranted certain facts to be true, including that UAMC carefully examined the loan transactions, guaranteed the soundness thereof, followed LBB's underwriting guidelines, and vouched for the veracity of the information supplied in the loan documents. UAMC also acknowledged in the Agreement that LBB purchased the loans in reliance upon UAMC's representations and warranties. In the event of a breach, UAMC agreed to repurchase a defective or non-conforming loan and/or to indemnify LBB for losses related to such loan. At issue in this lawsuit is residential mortgage Loan ****5128 (the "Loan") (borrower Horstmann).

UAMC originated the Loan and then sold it to LBB subject to UAMC's representations, warranties, and covenants set forth in the Agreement. Contrary to UAMC's representations and warranties, the Loan contained misrepresentations related to the borrower's length of ownership of her then-current residence as well as undisclosed mortgage debts. Additionally, the Loan suffered underwriting violations, including (1) a failure to verify borrower's 12-month mortgage history; and (2) "payment shock" (where the borrower's new housing payment is more than double her current housing payment), the presence of which required UAMC to switch the borrower into to a full documentation loan product—which UAMC failed to do.

UAMC breached the Agreement by selling a loan that contained misrepresentations and underwriting violations and by refusing to comply with its repurchase/indemnification obligations under the terms of the Agreement. Accordingly, LBHI respectfully requests the Court grant LBHI's motion for summary judgment as to UAMC's liability.

# PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

| Undisputed Fact | Supporting Evidence |
|---|---|
| 1. UAMC is engaged in the business of selling mortgage loans on the secondary market to investors such as LBB. LBB is now known as Aurora Commercial Corp, successor entity to Aurora Bank, FSB, f/k/a Lehman Brothers Bank. | **MSJ Exhibit 1**, Declaration of John Baker ("Baker Decl."), ¶¶ 4, 6.<br><br>*See also* UAMC's Answer to Amended Complaint ("Answer") ¶¶ 10, 11. |
| 2. Prior to the sale of the Loan, UAMC applied for and was granted "Delegated Underwriting Authority" on October 7, 2005. As a delegated underwriter, section 717 of the Seller's Guide required that UAMC's underwriting was to be in strict compliance with the Lehman underwriting guidelines contained in the Seller's Guides. | Baker Decl. ¶ 12 |
| 3. LBB was aware of the risks inherent in purchasing loans that it did not underwrite, which is one reason why LBB requires strict compliance with its underwriting rules and, through representations and warranties, contractually allocates the risks to the seller. | Baker Decl. ¶ 12. |
| 4. On September 20, 2005, UAMC and LBB entered into a loan purchase agreement (the "contract" or "Agreement"). The parties entered into an Addendum to the Agreement on October 1, 2006. | Baker Decl. ¶ 4 & Ex. 1; **MSJ Exhibit 2**, Declaration of Christopher Carrington filed simultaneously herewith ("Carrington Decl.") Ex. 1 at Defendants' Joint Response to Plaintiff's First Set of Requests for Admissions ("RFA Responses"), No. 2. |

| | |
|---|---|
| 5. The Agreement incorporates the terms and provisions of the Seller's Guide of LBHI's administrative agent, Aurora.*<br><br>**\*Given the large size of the Seller's Guide, only the relevant sections are provided in support of this motion; specifically, Sections 100, 103, 5 (inclusive), and 7 (inclusive).** | Baker Decl. ¶¶ 4, 5 & Ex. 2; Amended Complaint ("Amend Compl.") ¶ 14, Answer ¶ 14; Carrington Decl. Ex. 1 at RFA Response No. 3. |
| 6. The Agreement is governed by New York law. | Baker Decl. Ex. 1 at Section 8; AC ¶ 31 and Answer ¶ 31. |
| 7. UAMC sold various loans to LBB pursuant to the Agreement and Seller's Guide, including the Loan, and LBB paid for them. | Baker Decl. ¶ 7; *see also* Amend. Compl. ¶ 16; Answer ¶ 16; Carrington Decl. Ex. 1 at RFA Responses No. 17. |
| 8. LBB purchased the Loan from UAMC on December 30, 2005 at a net purchase price of $302,444.13. | Baker Decl. ¶ 16 & Ex. 7; *see also* Carrington Decl. Ex. 1 at RFA Response No. 15. |
| 9. At all relevant times to the claims herein at issue, Aurora was the authorized agent, servicer, and/or master servicer for LBB and LBHI for Loan 5128. In this capacity, Aurora was authorized and directed by LBB and LBHI to enforce any obligations owed to them related to the loan, and to sell properties securing the loan. At all relevant times, Aurora also served as the administrative agent of the "conduit" or correspondent program for LBB. | Baker Decl. ¶¶ 8, 9. |
| 10. As the administrative agent, Aurora performed post-purchase audits of various loan files in the event that a possible breach of a representation, warranty or covenant had been discovered. | Baker Decl. ¶ 9. |
| 11. LBB sold the Loan to LBHI on February 27, 2006, and assigned to LBHI all of LBB's rights in and to its Agreement with UAMC with respect to the Loan, including all rights in and to any and all representations, warranties or covenants made by UAMC in the Agreements and Seller's Guide and all rights to repurchase and indemnity remedies, among other things. | Baker Decl. ¶¶ 11, 14 & Exs. 3, 5. |

| | |
|---|---|
| 12. Prior to the sale of Loan 5128 to LBB, UAMC was granted "Delegated Underwriting Authority." | Baker Decl. ¶ 12 & Ex. 4; Carrington Decl. Ex. 1 at RFA Response No. 6. |
| 13. As the delegated underwriter, UAMC was responsible for choosing the loan product for the borrower, and following all provisions of the Agreement, including but not limited to the Seller's Guide. | Baker Decl. ¶ 13. |
| 14. As the delegated underwriter, UAMC placed the borrower into a Mortgage Maker No Document Loan. | Baker Decl. ¶ 16 & Ex. 7. |
| 15. LBB and LBHI maintain its loan tracking data on a proprietary data collection system called Whole Loan Tracking ("WLT"), which evidences transfer of the Loan from LBB to LBHI on February 27, 2006. | Baker Decl. ¶ 14 & Ex. 5. |
| 16. The borrower represented on her loan application that she owned and resided in the primary residence disclosed on the loan application (22911 Eagles Watch Drive) for four years and that the property security for the loan would be for investment. (*See* Exhibit 8, first page, top half of page to right, check box "investment"). | Baker Decl. ¶ 17 & Ex. 8; *see also* Carrington Decl. Ex. 1 at RFA Response No. 23. |
| 17. Public records reveal that the borrower purchased the 22911 Eagles Watch Drive just two months before closing on Loan 5128. | Baker Decl. ¶ 21; Carrington Decl. Ex. 5 |
| 18. Public records show Ms. Horstmann entered into a loan agreement on January 10, 2005 for $166,315.00, secured by property located at 31446 Shaker Circle, Wesley Chapel, Florida 33543. | Baker Decl. ¶ 26; Carrington Decl. ¶ 5 & Ex. 3 |
| 19. Public records show Ms. Hortsmann entered into a loan agreement on July 8, 2005 for $430,621.11, secured by property located at 2310 Brenthaven Crossing Ct, Lutz, Florida 33558. | Baker Decl. ¶ 26; Carrington Decl. ¶ 6 & Ex. 4 |
| 20. The borrower did not list the Shaker Circle property or the Brenthaven property on her loan application for Loan 5128. | Baker Decl. ¶ 26 & Ex. 8. |

| | |
|---|---|
| 21. The applicable loan product guidelines explain the rules pertaining to first time home buyers as follows:<br>First Time Homebuyers: Borrowers who have not owned a property within the last three years **or one who has not owned their first home for at least 12 months** are eligible as follows:<br>- Stated Income/Stated Assets and No Doc:<br>* * *<br>* * *<br>- <u>First Time homebuyers are ineligible for financing N/O/O or SH properties under this program.</u><br><br>(found on page 2 of Exhibit 14 under category "First Time Homebuyers")<br><br>"N/O/O" means non-owner occupied.<br><br>"12 month Mortgage/Rental History is **required**." (found on page 4 of Exhibit 14 under category "Mortgage/Rental Housing") | Baker Decl. ¶ 22 & Ex. 14 (underlined emphasis added). |
| 22. Section 502 of the Seller's Guide describes "significant payment shock" as a situation where the "payment more than doubles." This characteristic "indicate[s] full documentation is required." | Baker Decl. ¶ 24 & Ex. 2 § 502. |
| 23. As the new loan created payment shock, the borrower did not qualify for a reduced documentation loan product. | Baker Decl. ¶ 25 & Ex. 2 § 502. |
| 24. A review of the loan application reveals that borrower's monthly housing more than doubled with the new Loan, increasing from $1,613/month to $3,504.10. (*See* page 2 of Exhibit 8). | Baker Decl. ¶¶ 25 & Ex. 8. |
| 25. LBHI notified UAMC of the existence of payment shock for this loan by letter transmitted on August 23, 2012. | Baker Decl. ¶ 25. |
| 26. LBHI sold the loan to Freddie Mac on February 27, 2006. The loan subsequently defaulted and Freddie Mac foreclosed on the property. | Baker Decl. ¶¶ 18, 19 & Composite Ex. 9, 10. |
| 27. Freddie Mac initiated an investigation into the borrowers' file and discovered misrepresentations and underwriting defects in the loan. | Baker Decl. ¶ 19 & Composite Ex. 10. |

| | |
|---|---|
| 28. On March 31, 2008, Freddie Mac demanded LBHI make it whole for its losses incurred following foreclosure of the property securing Loan 5128. | Baker Decl. ¶ 19 & Composite Ex. 10. |
| 29. LBHI made Freddie Mac whole via a wire transfer that included payments for several loans, including $140,161.71 for Loan 5128. | Baker Decl. ¶ 20 & Exs. 11, 12. |
| 30. On August 20, 2008, Aurora sent a demand letter to UAMC notifying UAMC of the misrepresentation in the loan application. | Baker Decl. ¶ 21 & Ex. 13; *see also* Amend. Compl. ¶¶ 22, 25 & Ex. 5; Answer ¶¶ 22, 25. |
| 31. UAMC did not make LBHI whole for its losses within thirty (30) days of written notice and demand, or within thirty (30) days of UAMC's knowledge of the defects in the loan application for Loan 5128. | Baker Decl. ¶ 23; *see also* Amend. Compl. ¶ 26, Answer ¶ 26. |

## SELECT PROVISIONS OF THE SELLER'S GUIDE ("SG")
(*See* Baker Decl. Ex. 2)

**Section 701** of the Seller's Guide provides in pertinent part:

    [UAMC] acknowledges that Mortgage Loans are purchased in reliance upon: (i) the truth and accuracy of [UAMC's] representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide, each of which representations and warranties relates to a matter material to such purchase; and (ii) [UAMC's] compliance with each of the agreements, requirements, terms, covenants and conditions set forth in the Loan Purchase Agreement and this Seller's Guide.

**Section 702** of the Seller's Guide provides in pertinent part:
* * *
   8. **No Untrue Information.** Neither the Seller Application Package, the Loan Purchase Agreement, nor any statement, report or other document furnished or to be furnished by Seller or Seller's correspondent pursuant to the Loan Purchase Agreement or this Seller's Guide, contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading. Seller meets the Eligibility Standards and shall take all steps necessary to continue to meet the Eligibility Standards.

**Section 703** of the Seller's Guide provides in pertinent part:
[A]s to each Mortgage Loan, [UAMC] represents and warrants as of the related Purchase Date, and covenants that:

   1. **Mortgage Loans as Described.** No document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.
     \* \* \*
   8. **Origination, Underwriting and Servicing Compliance**. Seller, … has duly and faithfully complied with and will continue to comply with: (i) all applicable laws, rules, regulations, decrees, pronouncements, directives, orders and <u>contractual requirements</u> with respect to the origination, closing, underwriting, processing and servicing of each Mortgage Loan;
     \* \* \*
   12. **Validity of Mortgage Documents.** … The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading.
     \* \* \*
   21. **Origination; Payment Terms**. The Mortgage Loan has been originated and processed by Seller or Seller's correspondent in accordance with, and conforms with, the terms of this Seller's Guide and the Loan Purchase Agreement, and the Mortgage Loan has been underwritten in accordance with Underwriting Guidelines in effect as of the date of the Delivery Commitment applicable to the Mortgage Loan. The Mortgage Loan complies with all the requirements of the related Program Profile…
     \* \* \*
   27. **Acceptable Investment.** Seller represents that there is no circumstance or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor, or the Mortgagor's credit standing, that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan.

**Sections 710** of the Seller's Guide provides in pertinent part:

   In the event of a breach of any of the representations, warranties or covenants contained in Section 700 through 710 herein, which breach materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser, or materially and adversely affects the interest of Purchaser in the related Mortgage Loan…Seller shall…repurchase the related Mortgage Loan at the Repurchase Price. Any such repurchase shall occur no later than thirty (30) days after the earlier of the date on which Purchaser notifies Seller of such breach or the date on which Seller knows of such breach.

Notwithstanding any other provision…with respect to each Mortgage Loan that is the subject of any breach…if Purchaser…has acquired title to the related Mortgaged Property through foreclosure, deed-in-lieu…then, within thirty (30) days after Purchaser's demand therefor, Seller shall, at Purchaser's option: (i) purchase the Mortgaged Property from Purchaser at a purchase price equal to the Repurchase Price; or (ii)…indemnify Purchaser as specified in Section 711…

**Section 711** of the Seller's Guide provides in pertinent part:

In addition to any repurchase and cure obligations of Seller, … Seller shall indemnify Purchaser and Purchaser designee…from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or office of Seller or Seller's correspondent.

**Section 717** of the Seller's Guide provides in pertinent part:

Upon authorization to utilize delegated [underwriting] authority, Seller represents and warrants as of the Purchase Date of each Mortgage Loan delivered pursuant to the Seller's Delegated Underwriting Authority, in addition to the other representations and warranties contained within Section 7, the following:

1. All underwriting performed by Seller hereunder **shall be in strict compliance** with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time. …

4. Seller agrees to perform all underwriting functions with the same care and diligence as an experienced, prudent underwriter performing such duties in the industry with respect to similar mortgage loan products and, in any event, with no less care and diligence than if it were underwriting Mortgage Loans for its own account. …

6. Seller shall be responsible for approving only marketable Mortgage Loans and shall document its underwriting of each and every loan in a manner that justifies and supports such approval and marketability on the secondary mortgage market.

Seller acknowledges that failure of Purchaser to review or discover any deficiency of error in the Mortgage Loan at time of Purchase by Purchaser will neither release Seller from its obligations to provide any required documentation or correct any errors, nor will it prevent or inhibit Purchaser's exercise of any of its remedies.

**Section 502** of the Seller's Guide states in substantial pertinent part:

… Reduced Documentation (Lite Doc, Stated, No Ratio, No Doc, etc.) programs do not eliminate the necessity to closely review and evaluate all information available in the file to determine the reasonableness of the borrower's ability to repay the mortgage debt.

Reasonableness will be based on the borrower's employment history, income source and past credit experience which must be commensurate with the loan request. For example, information on the credit report should corroborate information on the application. Borrower's income source must be from a source likely to generate sufficient income to repay the debt. Material inconsistencies must be investigated. Loan requests for an applicant with atypical characteristics should require full income and asset documentation. For examples, presence of any of the following characteristics should indicate full documentation is required:

   1.  Transactions resulting in significant payment shock (payment more than doubles); or
   2.  Loan request is significantly larger relative to previous mortgage history; or
   5.  Inconsistent borrower information between loan applications for current transaction and previous transactions.

In addition, information disclosed in the file must also be taken into consideration. For example, payroll deposits shown on bank statement, disclosed in file will be used for calculating appropriate gross income.

All files must include the completed initial application. When the initial application is incomplete or missing from the Submission Package, the loan may not be processed using Reduced Documentation. All income sources must be itemized on the signed 1003 when applicable.

**Sections 501.2-1 and 501.2-3** of the Seller's Guide state in relevant part:

**Primary Occupancy.** Primary occupancy is a one- to four-family dwelling…that is occupied as the borrower's primary residence for a major portion of the year. A typical primary residence will meet the following criteria:
…
   3. Borrower(s) declare(s) his/her/their intention to occupy the subject.
…
   5. Limitations regarding the number of properties a borrower may own will be outlined in the applicable Program Profile.

   6. Transactions were occupancy is questionable will be treated as non-owner occupied.

**Investment Property.** Investment property is a dwelling occupied or intended to be occupied by someone other than the borrower. This definition is used whether or not income is derived from the property. Limitations regarding the number of properties a borrower may own will be outlined in the applicable Program Profile.

Financing for investment properties is available for those borrowers who have experience as a landlord. *See Landlord Experience* topic herein for more details.

**Section 501.5** of the Seller's Guide states in relevant part:

**Landlord Experience** Underwriting will take into consideration the number of properties owned and the length of time the properties have been owned. Investors who demonstrate a rapid acquisition (acquired within the most recent 24-month period) of investment properties will be reviewed cautiously. … In addition, the file must contain evidence the borrower has sufficient experience to handle the entire investment portfolio. Loans made to borrowers owning multiple non-owner occupied properties must meet the following additional guidelines:

1. File contains documentation evidencing borrower's experience owning multiple investment properties (two years of experience required); *or*
2. Borrower has acquired or is in the process of acquiring a maximum of (including subject property, if applicable):
   a. Less than or equal to two financed investment properties within the last six months; *and/or*
   b. Less than or equal to four investment properties within the last four years.

**Section 504.2-11** of the Seller's Guide states:

"Unless otherwise stipulated in the applicable Program Profile, files should contain verification of the borrower's 12-month payment history for all mortgages appearing on the credit report and initial application."

**Aurora's Product Revisions**, provided in Announcement C03-12, and supplied by UAMC in their document production, state in relevant part:

**Landlord Experience** … Loans made to borrowers financing N/O/O properties must meet the following:
[1.] At least 50% of the properties must have been owned for two years as of the date of closing, including subject property and any concurrent transactions.
[2.] All financed 1- to 4- unit properties, including borrower's primary residence and regardless of the source of financing, will be considered in the above eligibility determination.

*See* (Baker Decl. Ex. 14)

**MEMORANDUM OF LAW**

I.  **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) requires entry of summary judgment when the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment should be granted when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 317, 322 (1986).  The non-moving party must go beyond the pleadings and present affirmative evidence showing that there is a genuine issue of material fact for trial.  *Id.* at 252.  It is not sufficient for the non-moving party to show a mere "scintilla" of evidence, or evidence that is merely colorable or not significantly probative, in support.  *Id.* Contractual actions are often appropriate for summary judgment.  *See Modell's NY v. Noodle Kidoodle*, 242 A.D.2d 248, 250, 662 N.Y.S.2d 24 (1st Dep't 1997) (advising that breach of contract actions involving an unambiguous contract are particularly well-suited for summary judgment disposition).

II.  **UAMC BREACHED THE AGREEMENT**

Under New York law[2], the elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance by the plaintiff, (3) the defendant's failure to perform, and (4) resulting damage.  *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y. App. Div. 2009); *see Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

---

[2] In evaluating LBHI's claim for breach of contract, the Court should apply New York law pursuant to the choice-of-law provision in Section 8 of the parties' Agreement.  SMF ¶ 6.

Moreover, it is well-settled, including in cases that have interpreted and enforced this very Agreement, that a loan seller's failure to comply with its repurchase/indemnification obligations related to a defective or non-conforming loan constitutes a breach of contract.[3]

### A. A VALID CONTRACT EXISTS, AND LBHI PERFORMED

LBHI unquestionably satisfies the first two elements of its breach of contract claim against UAMC; it is undisputed that (1) a valid contract exists, SMF ¶ 4, and (2) LBHI (or its assignor) performed its obligation under the Agreement by paying UAMC for the Loan. SMF ¶¶ 7,8. LBB then sold the Loan to LBHI and assigned its rights in and to the Agreement with UAMC to LBHI. SMF ¶ 11. The only remaining question vis-à-vis UAMC's liability is whether UAMC breached its representations or failed to perform.

---

[3] *See, e.g., Lehman Bros. Holdings, Inc. v. PMC Bancorp*, 2013 WL 1095458, LA CV 10-07207-JAK (PJWx) (C.D. Cal. March 8, 2013); *Lehman Bros. Holdings, Inc., v. National Bank of* Arkansas, 875 F.Supp.2d (E.D. Ark. 2012); *Lehman Bros. Holdings, Inc. v. 1st New England Mtg. Corp.*, 2013 WL 3984413, *2-3, 09-11082-GAO (D. Mass. Sept. 12, 2012) (finding in favor of LBHI and noting that "by their agreements, the parties were allocating the risk of loss" and "the repurchase provisions were simply an allocation of a well understood risk"); *Lehman Bros. Holdings, Inc. v. California Fin. Group, Inc.*, 2011 WL 4375724 (C.D. Cal. April 25, 2011) (granting motion for partial summary judgment for five of six loans on substantially same contract and seller's guide); *Residential Funding Corp. v. Gen. Mortgage Corp.*, 2001 WL 228415, at *4 (D.Minn. March 2, 2001) (granting summary judgment in favor of plaintiff on claim defendant was obligated by loan purchase agreement to repurchase defective loans); *United Mortgage Corp. v. Plaza Mortgage Corp.*, 853 F.Supp. 311, 314 (D.Minn. 1994) (same); see also *Am. Gen. Fin. Servs. of Illinois, Inc. v. Riverside Mortgage Co., Inc.*, 455 F.Supp.2d 822, 830-31 (N.D. Ill. 2006) (finding pursuant to FED.R.CIV.P. 52(a) that defendant breached loan purchase agreement and ordering defendant to repurchase defective loans). *LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 638 (D. Md. 2002) (citing *Resolution Trust Corp. v. Key Fin. Svcs., Inc.*, 280 F.3d 12, 17-18 (1st Cir. 2002)) ( "Under New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract entitling the plaintiff to pursue general contract remedies for breach of contract."); *Key Fin. Corp.*, 2011 WL 1296731 at *11 (citing same).

## B. UAMC BREACHED THE AGREEMENT AND FAILED TO PERFORM

The Loan was underwritten for the No Documentation ("No Doc") loan program. SMF ¶ 14. The loan application required disclosure of debts as well as length of ownership of primary residence. *See* Ex. 8 to Baker Decl. (loan application). Also, the Seller's Guide instructs that any financing that will result in payment shock is ineligible for processing under reduced documentation programs, such as No Doc. SG § 502 (Baker Decl., Ex. 2).

Here, UAMC made representations as to (a) the veracity and validity of the documents and information in the loan file as well as (b) UAMC's compliance with the underwriting guidelines. These representations were false. The loan documents, including the loan application, misrepresented the length of time during which the borrower had owned her then-current residence, which caused borrower to be ineligible for an "N/O/O" loan (non-owner occupied) due to "first-time homebuyer" restrictions. Quoting Seller's Guide ("SG") §§ 501.2-3, 501.5, Baker Decl. Ex. 2; Baker Decl. Ex 14. UAMC, as underwriter, failed to verify the 12-month mortgage history for the borrower's then-current residence (which would have revealed the misrepresentation as to length of ownership). SG § 504.2-11. The loan application also omitted over half a million dollars in additional mortgage debt obligations. SMF ¶¶ 18-20. Finally, the loan documents revealed the presence of payment shock, rendering the borrower ineligible for a reduced documentation loan. SMF ¶¶ 22-24.

### 1. Misrepresentation as to Length of Ownership and Failure to Verify Mortgage Payment History

The borrower was seeking the Loan to purchase an investment or N/O/O property. SMF ¶ 16. "First time homebuyers" are ineligible for the purchase of investment or

N/O/O properties. SMF ¶ 21. "First time homebuyers" are defined as any person who has not owned their first home for at least a 12 month period. SMF ¶ 21.

In this instance, the borrower represented on her loan application that she owned and resided in her primary residence at 22911 Eagles Watch Drive for four years. SMF ¶ 16. Contrary to that representation, however, public records reveal that the borrower actually purchased the Eagles Watch property in September 2005, just *two months* before the Loan closed. SMF ¶ 17. Because the borrower had owned 2211 Eagles Watch Drive for only two months, rather than four years, she was considered a "First Time homebuyer" and therefore ineligible to obtain financing for an N/O/O property. SMF ¶ 21, SG §§ 501.2-3, 501.5. The applicable loan product guidelines explain the rules pertaining to First-Time homebuyers as follows:

> Borrowers who have not owned a property within the last three years **or one who has not owned their first home for at least 12 months** are eligible as follows:
> - [for] Stated Income/Stated Assets and No Doc:
>
> First Time homebuyers are ineligible for financing N/O/O or SH properties under this program.

SMF ¶ 21. Thus, not only did the length of ownership misrepresentation result in the borrower's ineligibility for an N/O/O loan, but the falsity of that information constitutes on its face a violation of UAMC's representations about the veracity of the loan documents and information. SG §§ 703(1), 703(12).

Additionally, the Seller's Guide instructs that a borrower who has owned a primary home for less than 2 years is not allowed to obtain financing on property to be used as an investment property. SG § 501.5. Thus, again, the borrower was ineligible

for an N/O/O property given the lack of proof that she had owned a primary home for two years or more.

What's more, UAMC promised to strictly comply with the underwriting guidelines:

> All underwriting performed by Seller hereunder shall be in <u>strict compliance</u> with the underwriting guidelines and product descriptions contained in the Seller's Guide and such other guidelines and requirements as may be provided to Seller in writing from time to time.

SG § 717. Yet, UAMC's underwriters did not verify the borrower's 12-month mortgage payment history for Eagles Watch Drive as required by the guidelines. *See* SMF ¶ 21; SG § 504.2-11. This failure not only constitutes a breach of Seller's Guide 504.2-11 but also highlights the purpose of this underwriting requirement; *i.e.* had UAMC chosen to follow these required safeguards, UAMC would have verified the borrower's 12-month mortgage history for Eagles Watch Drive and discovered that the borrower misrepresented her length of continuous ownership. And UAMC would have also been alerted that the borrower had just recently purchased Eagles Watch, giving rise to another red underwriter flag: rapid acquisition of property (addressed in greater detail below)[4]. Also, the materiality of UAMC's failure is beyond genuine dispute because the guidelines expressly state that the mortgage payment history is one of the most important underwriter functions when examining the borrower's creditworthiness: "…the most weight [is] placed on mortgage payment history." SG § 504.2-7.

---

[4] The rapid acquisition of property triggers additional scrutiny of a loan under the underwriting guidelines: "Investors who demonstrate a rapid acquisition (acquired within the most recent 24-month period) of investment properties will be reviewed cautiously…" SG § 501.5

16

**2. Undisclosed Mortgage Debts**

In addition to misrepresenting length of ownership, the borrower failed to disclose other mortgage debt obligations, resulting in additional UAMC misrepresentations about the transaction. *See, e.g.* SG §§ 703(1), 703(12). Specifically, prior to the closing of the Loan in November 2005, the borrower obtained a loan from Washington Mutual Bank on January 10, 2005 for $166,315.00, secured by property located at 31446 Shaker Circle, Wesley Chapel, Florida 33543. SMF ¶ 18. The borrower then encumbered herself with another loan from Washington Mutual Bank in the amount of $430,621.00 on July 8, 2005, secured by property located at 2310 Brenthaven Crossing Ct, Lutz, Florida 33558. SMF ¶ 19.

The borrower borrowed **over a half a million dollars** only months before she entered into the Loan, and failed to disclose these other properties on her loan application. SMF ¶ 20; *See* Ex. 8 to Baker Decl. (loan application). A borrower's failure to disclose debts, especially significant mortgage debt, impacts the value of the loan and the risk present therein. For example, had the debts been disclosed, the underwriter would have been required to check 12-month mortgage histories on borrower's other mortgages, further informing the underwriter of the borrower's creditworthiness. SG § 504.2-11.

Also, the two undisclosed properties plus the one disclosed property (Eagles Watch–about which the borrower misrepresented length of ownership) equals three residential properties acquired *in less than a year* before the subject transaction closed on November 29, 2005 (properties acquired in January 2005, July 2005, and September

2005). SMF ¶¶ 16, 18, 19. Had these facts been disclosed, the rapid acquisition of property would have certainly subjected the Loan to added scrutiny. *See* n. 4, *supra*.

### 3. Payment Shock

A review of the loan application demonstrates, on its face, that the borrower's housing obligation under the Loan would more than double her current housing payment: from $1,613.00/month to $3,550.49/month. SMF ¶ 24. Loans that more than double the borrower's housing payment constitute "payment shock" pursuant to Section 502 of the Seller's Guide. SMF ¶ 22. Payment shock requires that a reduced documentation loan be converted to a full documentation loan. SMF ¶ 22. UAMC's failure to remove the borrower from a reduced documentation loan as required by Section 502 of the Seller's Guide was a violation of the underwriting guidelines, with which UAMC promised to strictly comply. *See, supra*; SG § 717.

### C. THE LOAN DISPOSITION AND ADDITIONAL BREACH FOR FAILURE TO INDEMNIFY

Subsequent to the sale of the Loan by UAMC to LBB, and the sale/assignment of the Loan to LBHI, LBHI sold the Loan to Freddie Mac. SMF ¶ 26. Freddie Mac, after the Loan defaulted, demanded that LBHI indemnify Freddie Mac for losses on the Loan. SMF ¶¶ 26, 28, 29. LBHI, through its agent Aurora Loan Services, LLC, remitted $140,161.71 to Freddie Mac for its losses. SMF ¶ 29. LBHI, through Aurora, then requested repurchase/indemnification from UAMC on August 20, 2008. SMF ¶ 30. UAMC did not indemnify LBHI within 30 days of demand. SMF ¶ 31. As such, UAMC has not only breached its representations regarding the quality of the loan and underwriting set forth above, but has also breached its independent obligation to

18

repurchase a defective or non-conforming loan, or to indemnify for losses related thereto. SG § 711.

## CONCLUSION

As a result of the various defects set forth above, UAMC breached its representations regarding the quality of the loan, the veracity of the loan documents, and compliance with the underwriting guidelines. The loan contained misrepresentations of significant debt, of length of ownership, and of UAMC's compliance with the guidelines. Had UAMC only complied with the Seller's Guide and underwriting guidelines, either by converting to full documentation due to payment shock or obtaining a 12-month mortgage history as required, it would have discovered the misrepresentations present in the Loan, the same misrepresentations UAMC promised were not present. Consequently, LBB did not receive the product for which it bargained and purchased in reliance upon UAMC's representations. LBB received a product of lesser value and greater risk. Accordingly, UAMC breached the Agreement.

There is no genuine issue of material fact regarding UAMC's breach of contract with respect to the Loan. UAMC sold the loan to LBHI's assignor despite the misrepresentations in the loan file and the non-compliance with the underwriting requirements. UAMC also refused LBHI's demands for indemnification. These facts establish a breach of the parties' unambiguous contract and that LBHI is due judgment as a matter of law. LBHI respectfully requests that the Court enter summary judgment in its favor and against UAMC, finding UAMC liable for breach of the Agreement.

Respectfully submitted this 25th day of October, 2013.

                                    FOSTER GRAHAM
                                     MILSTEIN & CALISHER, LLP

                            By: *s/ Christopher P. Carrington*
                                Christopher P. Carrington
                                360 S. Garfield, 6th Floor
                                Denver, CO 80209
                                Telephone: 303.333.9810
                                Facsimile: 303.333.9786
                                Email: carrington@fostergraham.com

                            *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2013, a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** was electronically filed and served via *ECF* as follows:

    Marisa C. Ala
    Palumbo Bergstrom, LLC
    8375 South Willow Street, Suite 300
    Lone Tree, Colorado 80124
    mala@palumbolawyers.com

    Philip R. Stein
    Enza Boderone
    Bilzin Sumberg Baena Price & Axelrod, LLP
    1450 Brickell Avenue, Suite 2300
    Miami, Florida 33131
    PStein@bilzin.com
    EBoderone@bilzin.com


                                        *s/ Dyanna Spicher*