UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

**CASE NO. 1:13-CV-00090-PAB-MJW**

LEHMAN BROTHERS HOLDINGS, INC.,

      Plaintiff,

v.

UNIVERSAL AMERICAN MORTGAGE
COMPANY, LLC,

      Defendant.

---

## UNIVERSAL'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

In its motion for partial summary judgment in this case, Lehman Brothers Holdings, Inc. ("Plaintiff" or "LBHI") disregards fatal defects in its claims that warrant summary judgment *against* it, and unveils some entirely new claims. It also ignores all conflicting evidence as to each of its many disputed assertions (including whether the alleged "violations" occurred at all, and whether Plaintiff is even the proper party to bring this suit). The motion should be denied.

<u>Issues that Require Summary Judgment Against Plaintiff</u>[1]

On a host of bases, judgment as a matter of law should be granted to Defendant ("Universal"). First, Plaintiff's claims are time-barred under the "borrowing statute" portion of

---

[1] To avoid burdening the Court with redundant arguments and evidence, these issues will not be covered in great detail in this opposition memorandum, but will instead be addressed in depth in Universal's motion for summary judgment. Nevertheless, as a logical matter, these issues must be considered, along with other bars to summary judgment for Plaintiff, in conjunction with Plaintiff's motion for partial summary judgment.

New York's statute of limitations, which required Plaintiff's purported assignor (or anyone now standing in its shoes) to have brought suit within three years. Second, Plaintiff freely admits that its alleged loss on this loan was caused by Plaintiff's own breach of distinct provisions of a distinct contract, to which Universal was not even a party. Establishing causation is an absolute requirement to prevail on a breach of contract claim under governing New York law. Third, Plaintiff is ineligible on the case record to make a compensable indemnification claim under governing law. It cannot legitimately seek indemnification for its alleged breaches of a separate contract, particularly when the evidence establishes that Plaintiff was not compelled to make the alleged payment that constituted its loss, and did not timely notify Universal of the payment.

### Facts Pertinent to Plaintiff's Motion

*Key Background Information*

LBHI attempts in its motion to portray this matter as a "straightforward breach of contract action," (Pl. MSJ, 1) in which "UAMC breached [a loan purchase agreement] by selling a loan that contained misrepresentations and underwriting violations, and by refusing to comply with its repurchase/indemnification obligations under the terms of [that agreement]." (*Id.*, 2.) To the contrary, there are substantial disputes as to the underlying factual predicate of "violations" triggering "obligations." After furnishing some background facts that may be useful to the Court, Universal will document certain key areas of dispute. Universal will also demonstrate that Plaintiff's depiction of the parties' contract wildly overstates Universal's supposed obligations, and creates out of thin air an "allocation of risk" never agreed to in the contract, nor mentioned in any other document.

Universal, a residential mortgage company affiliated with Lennar (one of the nation's leading homebuilders), sold Lehman Brothers Bank ("LBB," formerly an affiliate of the

2

Plaintiff, and now known as Aurora Commercial Corp.) approximately 2000 residential mortgage loans over a period of many years. (Universal's Opposition ("Opp."), Ex. 1, Declaration of Becky Moore ("Moore Decl."), ¶ 3.) It sold no loans to LBHI (Moore Decl. ¶ 5); "LBHI didn't have a relationship with [Universal]." (Opp. Ex. 2, Declaration of Enza Boderone ("Boderone Decl."), Ex. A at 148:5-6, Sept. 11, 2012.) Universal made loans (with its own money) to buyers of new Lennar homes. (Moore Decl. ¶¶ 3-4.)

Universal did not have its own "loan products" to provide to borrowers, (Moore Decl. ¶ 3), so it would originate loans under a particular bank's loan product terms and guidelines, and then sell those loans to that bank, pursuant to the bank's prescribed pricing terms, and subject to the bank's review and approval of the loan. (Moore Decl. ¶ 4.) Universal immediately transferred to the purchasing bank virtually the entirety of Universal's files relating to the loan purchased. (Id.) The purchasing entity assumed all responsibility at the time of purchase for "servicing" the loan, which involved collecting and allocating loan payments, and communicating directly with the borrower as needed, among other things. (Id.)

Universal originated this loan to the borrower on November 29, 2005. (Baker Decl.,[2] Ex. 6.) It sold this loan pursuant to a contract with LBB (not Plaintiff), selling it to LBB's agent Aurora Loan Services on December 30, 2005. (Pl., Statement of Material Facts ("SMF"), ¶ 7; Baker Decl., Ex. 7.) MERS, the principal national repository for tracking the registration and transfer of mortgages, shows that LBB, not LBHI, thereafter sold the loan to Freddie Mac. (Moore Decl.¶14, Ex. D.) When Universal years later received a demand letter related to this loan, it came from Aurora Loan Services, expressly on behalf of LBB (not Plaintiff). (Baker Decl., Ex. 13 (Letter defines Lehman Brothers Bank, FSB as "Lehman," and makes demands on

---

[2] Declaration of John Baker attached as Exhibit 1 to Plaintiff's Motion for Summary Judgment.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

behalf of that entity)  And the January 2011 assignment agreement between LBB and Plaintiff, to which Plaintiff cites as evidence of the transfer of the right to bring claims such as this one, contains a clear carve-out for all loans that had not previously been sold or transferred by LBB to Plaintiff.  (Baker Decl., Ex. 3 § 1(c).)  Moreover, Aurora Loan Services made the alleged indemnification payment to Freddie Mac (Boderone Decl., Ex. E; Boderone Decl., Ex. B at 63:4-6, 64:2-5), and Plaintiff's Rule 30(b)(6) witness, John Baker (who submitted a declaration in support of Plaintiff's motion) testified that he did not know whether LBHI was even aware of that payment when it was allegedly made. (*Id.*, 66:22-67:9.)

Approximately two full months after LBB bought this loan from Universal, either LBB (according to MERS) or Plaintiff (according to Plaintiff) sold it to the Federal Home Loan Mortgage Corporation ("Freddie Mac").  (Moore Decl. ¶ 14, Ex. D.)  As a condition of any sale to Freddie Mac, LBB or Plaintiff had to make extensive, independent representations and warranties, attesting to the high quality of the loan, and the accuracy and completeness of all information submitted in connection with each loan application and overall loan file.  Those included the following, among others:

- That all data and information provided about the loan was true, correct and accurate. (Boderone Decl., Ex. F at FM-LB HOR 2576; Baker Decl. Ex. 8 at 5.)

- That it had not misstated or omitted any material fact about the mortgage in selling the mortgage to Freddie Mac.  (Boderone Decl., Ex. F at FM-LB HOR 2575.)

- That it was fully liable for all representations and warranties even though it had not originated the mortgage. (Boderone Decl., Ex. F at FM-LB 2960.)

4

- That this was an "investment quality" mortgage, specifically meaning that Freddie Mac should have no reason to expect that the borrower would not repay his debt. (Boderone Decl., Ex. F at FM-LB 2958.)

- That LBB (or Plaintiff) had determined that the borrower's credit reputation, credit capacity and collateral were all acceptable. (Boderone Decl., Ex. F at FM-LB 3248.)

- In fact, LBB (or Plaintiff) was specifically "required," before selling the loan to Freddie Mac, to "document the [b]orrower's credit reputation and [its] determination that the [b]orrower's credit reputation was acceptable"; it was also required to validate that all information on the credit report was accurate and acceptable, and had to document the mortgage payment history of the borrower. (Boderone Decl., Ex. F at FM-LB 3279-3281, 3289-3291) (emphasis added).

Plaintiff now contradicts all of those determinations, and its related representations and warranties. But they were only the beginning of what was required of any party that sold directly to Freddie Mac. Freddie Mac's Seller/Servicer Guide, which is a matter of public record, imposed far more detailed requirements, and was far more onerous, than the Aurora/LBB Seller's Guide. Thus, it is by no means automatic (or even likely) that a breach of Freddie's guide would constitute a breach of the other guide.

As an evidentiary matter, the fundamental contradictions between Plaintiff's current allegations and its prior confirmations to Freddie Mac of this loan's compliance *even with far more stringent contractual requirements than those in Universal's contract with LBB* certainly cannot simply be swept aside via a judgment on Plaintiff's motion. The jury, as fact-finder, must assess the evidence and weigh the credibility of Plaintiff's current claims of "breach," in

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

juxtaposition to its past claims that the loan was fully compliant. New York courts consistently hold that summary judgment is improper when inconsistencies or contradictions exist between statements made by a party.[3]

In addition, Plaintiff's current depiction of the Aurora/LBB Seller's Guide as an inflexible document permitting Universal, as underwriter, no discretion as to how to apply the "guidelines" (not "requirements") set forth therein is refuted by the plain text of those guidelines. Indeed, under the boldface heading "**Management Philosophy**," the Seller's Guide expressed Aurora/LBB's recognition that, "[b]ecause each loan is unique and underwriting is an art, not a science, underwriters are expected and encouraged to use professional judgment in making a lending decision." (Baker Decl., Ex. 2 at 9 (§ 500.2).) The Aurora/LBB Seller's Guide proceeded to state, among many other such assurances of flexibility and ability to use discretion, that "Our goal is to simplify both underwriting policy and processing documentation"(*id.*, 2 (§ 502); and "Ratios [such as debt-to-income ratios] are general benchmarks, not definitive guidelines. The overall merits of the file will be considered when applying ratio guidelines. As such, underwriters may approve loans with ratios exceeding guidelines [limits] and decline loans that are within these parameters." (*Id.*, 4I (§ 506.I).) Indeed, the same Guide informed Universal that "judgment must always be used in determining whether to make exceptions for deficiencies such as higher debt ratios on an individual transaction," and listed a variety of

---

[3] *See, e.g., Glencore Denrees Paris v. Dep't of Nat. Store Branch 1*, No. 99 CIV. 8607 (RJS), 2008 WL 4298609 (S.D.N.Y. Sept. 19, 2008) (denying defendant's motion for summary judgment due, in part, to contradictions between defendant's prior representations and its affidavits in support of its motion); *Saaverda v. E. Fordham Rd. Real Estate Corp.*, 649 N.Y.S.2d 416 (1996) (affirming the lower court's denial of plaintiff's motion for partial summary judgment due to inconsistencies between his deposition testimony and his own account provided in support of the motion); *Genender v. Nw. Mut. Life Ins. Co.*, No. 01 CIV. 1138 (LLS), 2004 WL 1872289 (S.D.N.Y. Aug. 19, 2004) (denying defendant's motion for summary judgment due to conflicting evidence arising from plaintiff's multiple deposition sessions);

6

factors to be considered "at [Universal's] sole discretion." (*Id.*, 43 (§ 506.6).) Accordingly, when Universal represented and warranted that it had complied with the contract's underwriting guidelines (id., 73 (§ 703(8)), it *was* "compliant" when it exercised discretion and professional judgment about the application as a whole, as stipulated by the foregoing guideline provisions and many others.

In contemporaneous prospectuses sent to prospective investors in pools of securitized loans that it acquired from loan sellers such as Universal, Plaintiff further attested to the discretion given to those loan sellers:

> *Underwriting Guidelines.* The LBB Guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. . . . <u>On a case-by-case basis, the underwriter may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception.</u> Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, good credit history, stable employment, financial reserves and time in residence at the applicant's current address. <u>A significant amount of the Mortgage Loans may represent underwriting exceptions.</u>

(Boderone Decl., Ex. G, emphasis added.)

### Additional Mischaracterizations by Plaintiff

Plaintiff asserts on multiple occasions in its motion that "the risk of [borrower] misrepresentations or underwriting defects was allocated to [Universal]." (*E.g.*, Pl. MSJ, 2). On each such occasion, it does so without citation to any portion of the parties' voluminous agreement, or any other document. This is consistent with its Rule 30(b)(6) representative's statements, in deposition testimony and his declaration, of his legal conclusion (as a non-lawyer) that all financial risk was on Universal (a non-guarantor on the loan). But, when pressed about where, either in the parties' agreement or any other document, *anything* says that all risk is on Universal, that representative, John Baker, faltered noticeably. "That language isn't in there

verbatim," "but - but the understanding between both parties *should have been* that the risk for those misstatements was on the correspondent," and "**I don't think it needs to be stated**," Mr. Baker testified. (Boderone Decl., Ex. A at 74:5-24, 295:20-296:8 (emphasis added)).

Plaintiff regularly filed annual and quarterly reports with the Securities and Exchange Commission in the relevant time period. Mr. Baker acknowledged that Plaintiff certainly was not telling readers in those filings that all risk associated with what it conceded were high-risk loan products was somehow off-loaded to small correspondent lenders like Universal. *Id.*, 186:5-187:2 ("I'm not aware of any -- any statement with that specific language in it, no.")).

In its depiction of LBB's contract with Universal, Plaintiff revises history in other ways as well. Plaintiff acquired loans from loan originators across the country, in order to re-sell those loans later for a profit. It wants the Court to believe that it carefully built up bulwarks to ensure that only loans with the strongest safeguards against borrower defaults or misrepresentations ever were purchased by it or its affiliates. But nothing could be more illustrious of the disconnect between past truth and present fiction than Plaintiff's current claims against Universal.

This loan was originated under Plaintiff's guidelines for one of its proprietary loan products -- the "No Doc[umentation]" loan. "No doc" loans were ones in which LBB advised correspondent lenders such as Universal in writing that the borrower must *not even disclose her income or assets* during the loan application process, and the borrower's self-reported employment position was not to be verified. (Baker Decl., Ex. 9 at 40 ("No Doc").) So Plaintiff is in essence telling the Court that it was quite all right that Plaintiff knew nothing at all about the borrower's income, or assets, and that employment was unverified (the three primary indicia of creditworthiness), but it *never* would have purchased this loan had it only known that the borrower was a "first-time homebuyer" (which she was not, anyway).

8

Plaintiff's brand new allegations in this motion of alleged "undisclosed" debts and the supposed absence of a form documenting the borrower's 12-month mortgage payment history also strain credulity in multiple respects. For one thing, evaluation of the materiality of debts is rather meaningless without knowledge of a borrower's income level or assets. For another, Plaintiff neglects to share with the Court this feature of the applicable Aurora/LBB Underwriting Guidelines: under the heading "Maximum Exposure," Aurora/LBB declared in its Seller's Guide that any one borrower was permitted to have (simultaneously) "unlimited" primary residences, plus ten "second homes," plus ten "non-owner-occupied" properties. (Baker Decl., Ex. 9 at 47; *see also* Baker Decl., Ex. 2 at 13-14 (§ 501.4). Thus, Plaintiff's implicit position in this Court is this: if borrower Horstmann, who, per Plaintiff's guidelines, had furnished no information whatsoever about her income or assets (and whose employment had not been verified), had simultaneously owned an "unlimited" number of primary residences, ten "second homes," and ten non-owner-occupied properties, that, in and of itself, would be fine, and Plaintiff would be happy to purchase a new loan made to her for yet another house purchase. But if Plaintiff years later claimed, for example, that it did not have information about the debt owed on even one of that possibly infinite number of homes, Universal bore "all risk," is "in breach," and Plaintiff "relied to its detriment." That is madness.

**Conflicting Evidence as to Disputed Facts**

Plaintiff alleges four loan "defects." Two of them were never alleged before this motion (failure to verify mortgage history and undisclosed debts). Another one ("payment shock") was never pursued as the basis for a breach of contract claim throughout a two-year lawsuit between these parties in the Southern District of Florida that involved this same loan and seven others. The only pre-litigation demand letter that Universal ever received regarding this loan, a letter

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

that was sent in August 2008, made no reference either to the two newly asserted "defects" or to the alleged payment shock issue. (Baker Decl., Ex. 13.)

Just as disturbing as Plaintiff's sudden injection of new issues is the fact that it completely disregards clear disputes between the parties as to issues that are central to its motion (but not material to Universal's forthcoming cross-motion, which will establish why these areas of dispute need not even be addressed). First, Plaintiff alleges that the borrower misrepresented on her loan application the length of her residency at a prior address, and therefore should have been categorized as a "first-time homebuyer" in the loan underwriting process. (LBHI MSJ, 14.) But the borrower's error did not go uncorrected,[4] and warranty deeds demonstrate that the borrower had owned another property for more than two years in the relevant time period, meaning that she was not to be regarded as a "first-time homebuyer." (Boderone Decl., Ex. J at LBHI-UAMC007035.)

Under the "No Doc" program profile guidelines, a first time homebuyer is defined as someone who has not owned her first home for at least 12 months. (*Id.*) Borrower Horstmann, however, had owned a property at 27027 Brush Creek Way, Wesley Chapel, FL 33544 for well over 12 months, as evidenced by a Warranty Deed, recorded 6/20/03 under OR5421 PG1522 (Boderone Decl., Ex. H) and a subsequent Warranty Deed recorded on September 30, 2005 (Boderone Decl., Ex. I). At Plaintiff's Rule 30(b)(6) deposition, it confessed that it did not have any evidence that the borrower had not owned a prior residence for 12 months. (Boderone Decl., Ex. B at 26:7-22).

---

[4] Before selling this loan, Universal delivered to its contractual counter-party, Lehman Brothers Bank ("LBB," now known as Aurora Commercial Corp.), a timely and valid credit report that highlighted the borrower's error. (Moore Decl. ¶ 15.) LBB knew exactly what Universal knew.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Second, Plaintiff now claims "payment shock" (meaning that the borrower's prior mortgage payment was less than one-half what the mortgage payment was to be on the new property). (*See* Pl. MSJ, 17). Curiously, Plaintiff first claimed that something was amiss in this regard almost <u>seven years</u> after receiving the loan application to which it cites. But Plaintiff establishes this supposed "doubling" only by elevating form over true substance, and comparing apples to oranges. Universal was not even required by LBB to address or calculate "payment shock" on this type of loan (perhaps because both parties recognized it would have been meaningless, given that the borrower was not to disclose income or asset information). (Moore Decl. ¶¶ 8, 9, Exs. A and B.) Because payment shock was not to be calculated under LBB's liberal underwriting guidelines, Universal's loan officer filled in certain line items on the loan application (like the amounts of the borrower's property taxes and hazard insurance payments) with zeroes. But, as is surely obvious to Plaintiff, that did not mean that, in reality, the borrower actually paid nothing for any of those items. In fact, had Plaintiff done the minimal research necessary to check on property taxes paid for that address in the relevant time period, it would have seen that the borrower's new total monthly payment would *not* be double its prior payment (with taxes included). (Moore Decl. ¶ 13, Ex. C.)[5] And, in any case, Freddie Mac never raised this issue with Plaintiff or Aurora, so any indemnification payment that either entity made had nothing whatsoever to do with this issue, and plainly therefore did not cause any loss to Plaintiff. (Baker Decl., Ex. 10.)

---

[5] Plaintiff does not always claim to believe that zeroes placed on a loan application (reflecting something that did not need to be calculated) mean that the "real number" would likewise have been zero if the data had been obtained. Mr. Baker, as Rule 30(b)(6) representative of Plaintiff, was asked if he believed that another set of zeroes <u>on the same page of the same loan application</u> -- zeroes that reflected the fact that the borrower was not to disclose her salary or asset information --led him to conclude that the borrower really had no income and no assets. He did not draw that conclusion from that set of zeroes. (Boderone Decl., Ex. B at 40:10-41:4.)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Two remaining brand new "defect" allegations likewise cannot withstand scrutiny. Plaintiff bemoans the supposed absence from the file of a "12-month mortgage payment history" for the borrower -- but Plaintiff represented and warranted that everything that needed to be in the file was in the file when Plaintiff (or LBB) sold the loan to Freddie Mac. (Boderone Decl., Ex. F at FM-LB 3279-3281, 3289-3291) (*Plaintiff itself* was to document that history). Plaintiff has offered no evidence that establishes that newly-alleged "undisclosed liabilities" were liabilities of this borrower at the time of the loan application. In addition, the materiality of the liabilities of a borrower on a "No Doc[ument]" loan such as this one is very much open to question in any event, given that Debt-to-Income ratios were not even to be calculated in connection with this LBB loan product. (Moore Decl. ¶ 8; Boderone Decl., Ex. J at 5 ("No Doc").)

Moreover, as to alleged "undisclosed debt," Freddie Mac never raised this issue with Plaintiff or Aurora/LBB, so any indemnification payment that either entity made had nothing whatsoever to do with this issue, and plainly therefore did not cause any loss to Plaintiff. (Baker Decl., Ex. 10.) In short, it is entirely unclear why Plaintiff would state that there are no genuine issues of material fact in dispute, and also unclear why Plaintiff would sue Universal on issues, such as "payment shock," among others, that it was expressly told by LBB/Aurora that it need not even calculate.

## Admitted Lack of Causation Means No Liability

What is clear, by contrast, is that causation and materiality are entirely lacking as to these allegations of defects. In deposition testimony, Plaintiff has made a series of devastating admissions about what caused its "loss" on the Horstmann loan (which apparently consists of an indemnification payment that it allegedly made to Freddie Mac).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

They are devastating because, as Plaintiff acknowledges in its Motion, one of the indispensable elements of any breach of contract claim under governing New York law is "resulting damage." (Pl. MSJ, 8 (emphasis added), citing two New York cases). Likewise, the very contract provision (section 711 of the Aurora Seller's Guide (*see* Baker Decl., Ex. 2 at 86-87)) that Plaintiff purports to be "enforcing" in its demand for indemnification clearly requires proof of a causal connection. Under the contract, indemnification is to be paid for losses "related to or resulting from" a breach by Universal. (Pl. MSJ, 7.)

Plaintiff, however, has repeatedly admitted that any payment that was allegedly made on its behalf to Freddie Mac resulted from *Plaintiff's own* alleged breaches of separate representations and warranties, in a separate contract to which Universal was not even a party. (Boderone Decl., Ex. A at 89:25-93:15, 124:11-13 (Q. Well, **you made a payment because of an alleged breach by Lehman of a separate contract? A. That's why we made the payment, yes**); 124:23-125:9 ("Had we not indemnified Freddie or Freddie then we wouldn't have had a loss"; 220:12-13 ("Yes. We wouldn't have suffered a loss **if we had not breached our agreement with them**.").) Plaintiff certainly does not know what considerations motivated that payment to Freddie Mac (a purchaser of loans in staggering volumes), if indeed the payment was made. (Boderone Decl., Ex. B at 66:22-67:9, Sept. 25, 2013). Plaintiff indeed concedes that any such payment may have been made for "political" reasons, in order for Plaintiff to maintain a good relationship with Freddie Mac: "I don't know what [the payer] was thinking at that time, but I understand that's a pretty common consideration in business generally." (Boderone Decl., Ex. A at 91:18-92:9.)

New York case law emphasizing the importance of establishing a direct causal relationship between a purported breach and a resulting financial loss is in heavy supply. "It is

13

axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach." *Pesa v. Yoma Development Group, Inc.,* 18 N.Y.3d 527, 532 (2012); *see also In re: Residential Capital, LLC, et al.,* 2013 WL 412927, p. 24 (S.D.N.Y., Feb. 1, 2013) (case involving mortgage repurchase claims that makes same point).

The Second Circuit held in *Nat'l Market Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525-26 (2d Cir. 2004) that "[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately* caused his or her damages... Moreover, damages 'may be so remote as not to be directly traceable to the breach, or they may be the result of *other intervening causes,* and then they cannot be allowed.' ") (citation omitted, emphasis original); E. Allan Farnsworth, CONTRACTS (3d ed. 2004), § 12.1, at 150 ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss.")

When a party has failed to come forward with evidence sufficient to demonstrate damages flowing directly from the breach alleged, dismissal of the breach of contract claim is in order. *Lexington 360 Associates v. First Union National Bank of North Carolina,* 234 A.D.2d 187, 189-90 (N.Y. App. Div. 1996); *Leigh Management Associates v. Weinstein,* 251 A.D. 2d 225, 226 (N.Y. App. Div. 1998) (judgment for defendant as a matter of law where claim did not demonstrate a causal relationship between the purported conduct and any damages suffered by the plaintiff). Plaintiff has failed to come forward with such evidence, and has likewise failed to satisfy the required elements for a claim of breach of contract.

<u>The Necessity of a Case-by-Case Analysis</u>

Plaintiff makes the erroneous contention that "it is well-settled" that mortgage loan repurchase or indemnification obligations should be construed as sweepingly as Plaintiff

14

evidently construes them. (LBHI MSJ, 13). There are several problems with that assessment of the state of the law. First, Plaintiff would do well to recall how this case came to be filed in this Court, and why it pertains to just one loan. A federal judge in Florida severed each of Plaintiff's eight "defective loan" claims against Universal, one of which was this one, from one another. The finding that led him to do so can hardly be disputed. Judge King of the Southern District of Florida issued a written order, in which he reasoned,

> [E]ach of these loans was made at a different time, to different borrowers, in different locations involving different purchases of different real properties; most fundamentally, each loan requires separate proof as to whether a breach occurred, what damages, if any, flowed from any such breach, and what the amounts of any such damages are.

(Boderone Decl., Ex. C at 1-2). This Court (Arguello, J.) reached the same conclusion when Plaintiff sought to re-consolidate seven of the severed claims in this Court. The Court observed that,

> These cases involve different questions of law and fact. Although each loan arises from the same loan purchase agreement, each individual loan concerns different sections of that agreement, which require distinct legal analyses. The cases involve different [loan officers], borrowers, property, and loan products, defects, and documentation.

(Boderone Decl., Ex. D at 4).

Accordingly, Plaintiff's listing of some cases (involving *other* defendants) in which it or *other* loan purchasers prevailed is truly no different, and no more persuasive, than a plaintiff in any other type of breach of contract action listing contract cases across the country in which a plaintiff prevailed. In any event, having filed several hundred cases of this type against correspondent lenders throughout the country ever since its descent into bankruptcy, it is notable how *few* cases Plaintiff can point to in which it has received favorable rulings.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

And here are just a few of the many instances in which LBHI has either lost a loan repurchase case outright or had motions of this type denied: *Lehman Brothers Holdings, Inc. v. Evergreen Moneysource Mortgage Company*, 793 F.Supp.2d 1189 (W.D. Wash. 2011) (Plaintiff's claims barred by statute of limitations because date on which loan seller makes representations and warranties controls for limitations purposes); *Lehman Brothers Holdings Inc. v. Gateway Funding Diversified Mortgage Services, L.P.*, 2013 WL 1773818 (E.D.Pa. Apr. 25, 2013) (whether there was a material misrepresentation by borrower was an issue of fact that must be resolved by fact-finder); *Lehman Brothers Holdings, Inc. v. Direct Mortgage Corp.*, Case No. 09-04170 (C.D. Cal. Feb. 23, 2012) (denying motion for summary judgment due to disputed issues of material fact that included "whether the alleged misrepresentations in the underlying loan documents were material" and "whether Lehman has standing as to four of the five loans," and holding that "the Court cannot weigh conflicting evidence on a motion for summary judgment"); *Lehman Brothers Holdings, Inc. v. Cornerstone Mortgage Company*, 2011 WL 649139, *3 and *14 (S.D. Tex. 2011) (denying summary judgment motion due to inconsistent evidence as to whether LBB sold the loan to LBHI, and because there was no obligation to repurchase when repurchase had not been demanded in notice letter, and there may have been waiver by LBHI).

### Response to Statement of Undisputed Material Facts

1. **Disputed** that Universal currently sells any loans to LBB. It ceased doing so at least six years ago. (Moore Decl. ¶ 16.) Otherwise, admitted.

2. **Disputed** in that the cited excerpt of the Seller's Guide speaks for itself, and refers to underwriting guidelines and loan program profiles, which in turn emphasize flexibility, use of discretion and professional judgment, and the lack of any need to collect various kinds of

information or perform certain traditional calculations. (*See, e.g.*, Baker Decl., Ex. 2 at 9, 23, 41 (§§ 500, 502, 506); and Loan Program Profiles (Boderone Decl., Ex. L) for various products, including "No Doc" loans such as this one). Otherwise, admitted.

3. Admitted that LBB was well aware of the risks. **Disputed** that the contract allocated all risk to correspondent lenders, such as Universal. (Boderone Decl., Ex. A at 74:5-24, 295:20-296:8.)

4. Admitted.

5. **Disputed** as to the reference to Aurora Loan Services as "LBHI's administrative agent." Universal sold loans to LBB, not LBHI (Baker Decl., Ex. 1), and received communications from Aurora Loan Services that invariably were expressly sent on behalf of LBB, not LBHI (*see e.g.*, Baker Decl., Exs. 13, 15, 17 and 18). **Disputed** also that the only "relevant" portions of the Seller's Guide are listed by Plaintiff here. Section 6, which was not provided by Plaintiff, bears on Plaintiff's review and analysis of the loans it receives, and is thus highly relevant. (Boderone Decl., Ex. K.)

6. Admitted.

7. **Disputed** that this loan was sold to LBB; it was sold to LBB's agent Aurora Loan Services. (Moore Decl., Ex. D; *see also* Baker Decl., Ex. 5 at 1.) Otherwise, admitted.

8. **Disputed** that Universal sold LBB the loan. (See No. 7, above). **Disputed** also as to the reference to "net purchase price," which is vague and irrelevant for purposes of this motion

9. **Disputed** that Aurora Loan Services was "LBHI's administrative agent." (See No. 5, above). Also, LBHI, which has the burden of proof, has offered no documentary proof of Aurora Loan Services' supposed general authorization to act on LBHI's behalf, as distinct from LBB's.

17

10. **Disputed** that Aurora Loan Services was LBHI's "administrative agent" for these purposes. (See No. 5, above). **Disputed** that Aurora's post-purchase audits took place because a possible breach or violation had been discovered. It undertook post-purchase audits within three days after purchase of the loan, per Section 6 of the Seller's Guide. (Boderone Decl., Ex. K at § 600.5.)

11. **Disputed**. There is conflicting evidence as to whether LBB ever transferred this loan to LBHI. (Moore Decl., Ex. D; Baker Decl., Ex. 13). Exhibits 5 and 6 to the Baker Declaration shed no light on this subject. Further **disputed** in that the purported assignment (Baker Decl., Ex. 3) contains express carve-outs for, among other things, loans that had never been transferred by LBB to LBHI (*id.*, § 1(c).)

12. Admitted.

13. **Disputed**. The underwriter does not choose the loan product for the borrower. The underwriter provides product options that may be of interest to a borrower. (Moore Decl. ¶ 7.)

14. **Disputed** as stated. The underwriter does not "place" the borrower in a particular loan program; the borrower chooses one for herself based on information provided. Admitted that the loan was an LBB/Aurora proprietary "No Doc" loan.

15. **Disputed**. LBB (now Aurora Commercial Corp.) and LBHI are distinct companies that indeed sue loan originators separately, often each suing the same company in different lawsuits. Accordingly, the reference to LBB and LBHI maintaining "its" loan tracking data is in error. Disputed also that the records referred to, which are hearsay and have not been properly authenticated in any event, "evidence" such a transfer. They are ambiguous.

16. Admitted.

17. Admitted.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

18. Admitted.

19. Admitted.

20. Admitted only insofar as this mortgage was not released or satisfied at the time of loan origination.

21. **Disputed**. The document speaks for itself, and the cited excerpts omit all necessary context, including the portions of the Guide and Loan Program Profiles already detailed in this memorandum.

22. **Disputed**. The document speaks for itself, and the quoted excerpt omits the word "should" and omits all context emphasizing discretion and professional judgment, as quoted in this memorandum. Irrelevant in any event since LBB/Aurora told Universal that whether to calculate payment shock at all was left to its sole discretion. (Moore Decl.¶ 9, Exs. A and B.)

23. **Disputed** that the new loan created payment shock, for the reasons already discussed in this memorandum.

24. **Disputed** for the reasons discussed in this memorandum. Plaintiff is comparing a new payment total that includes taxes and insurance to an old payment figure that did not include taxes and insurance that had in fact been paid. (Moore Decl. ¶¶ 11, 12.)

25. Admitted that LBHI sent a letter claiming payment shock for the first time on that date.

26. **Disputed** that LBHI sold the loan. (Moore Decl. ¶ 5; Baker Decl., Ex. 13.) On information and belief, admitted as to the foreclosure.

27. **Disputed**. Freddie Mac alleged breaches by Plaintiff of Plaintiff's underwriting obligations under an entirely separate, and more onerous contract. (Baker Decl., Comp. Ex. 10.)

28. Admitted.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

29. **Disputed**.  The cited exhibits appear to indicate that Aurora was preparing to make a payment, as to a large number of loans.

30.  Admitted that a letter was sent on behalf of LBB (not LBHI).  The document speaks for itself.

31. **Disputed** that any obligation exists to do so (for all the reasons already detailed herein), and disputed that Universal had knowledge of "defects."

For all the foregoing reasons, and on the authorities cited, Universal respectfully requests that Plaintiff's motion be denied.

Respectfully submitted,

By: /s/Philip R. Stein
Philip R. Stein, Esq. (Florida Bar No. 67278)
pstein@bilzin.com
Enza G. Boderone, Esq. (Florida Bar No. 0792411)
eboderone@bilzin.com
BILZIN SUMBERG BAENA PRICE
& AXELROD LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone:  (305) 374-7580
Facsimile:   (305) 374-7593

&

Marisa C. Ala, Esq. (#38693)
PALUMBO BERGSTROM LLP
8375 South Willow Street, Suite 300
Lone Tree, CO 80124
Tel/Fax: (303) 694-0561
mala@palumbolawyers.com

*Attorneys for Defendant*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was served on counsel for Lehman Brothers

Holdings, Inc. via ECF this 18th day of November, 2013:

FOSTER GRAHAM MILSTEIN & CALISHER, LLP
Christopher P. Carrington
carrington@fostergraham.com
360 S. Garfield Street, 6th Floor
Denver, Colorado 80209

/s/Enza G. Boderone
Enza G. Boderone, Esq.

MIAMI 3935756.3 72743/35700

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456