UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

CASE NO. 1:13-CV-00090-PAB-MJW

LEHMAN BROTHERS HOLDINGS, INC.,

    Plaintiff,

v.                                              **(Oral Argument Requested)**

UNIVERSAL AMERICAN MORTGAGE
COMPANY, LLC,

    Defendant.

---

## UNIVERSAL'S MOTION FOR SUMMARY JUDGMENT

---

Universal American Mortgage Company ("Universal") moves for summary judgment as to all claims asserted by Lehman Brothers Holdings, Inc. ("Plaintiff" or "LBHI"). Universal makes this motion on each of three independent bases.

First, New York law, which applies to the contract at issue, bars Plaintiff's claims under the "borrowing statute" portion of New York's statute of limitations. Plaintiff claims to stand in the shoes of its purported assignor, Lehman Brothers Bank, FSB ("LBB"). LBB is a federal savings bank. Federal law defines what a federal savings bank's principal place of business is, and makes the concepts of "principal place of business" and "home office" one and the same for such a bank. At all relevant times, LBB designated Wilmington, Delaware, in its chartering documents and elsewhere, as the place of its "home office" and "principal place of business."

A key feature of New York's statute of limitations is that actions accruing outside of New York to non-residents of that state must be filed within the limitations period of that party's state of residency. Delaware's statute of limitations applicable to the claims asserted in this case is three years. All contractual representations and warranties that Plaintiff contends (erroneously) that UAMC breached were made by UAMC well over three years before Plaintiff filed the 2011 lawsuit in the Southern District of Florida that preceded this one. Case law applying Delaware's three-year statute of limitations establishes that a breached representation or warranty is the indispensable "trigger" for any claim made by Plaintiff against UAMC in this case.

Second, Plaintiff freely admits to a lack of any causal connection between the alleged "violations" *by Universal* and the loss allegedly suffered *by Plaintiff*. Establishing causation is an absolute requirement to prevail on a breach of contract claim under governing New York law. Plaintiff's conceded inability to establish direct causation therefore requires judgment for Universal as a matter of law.

Third, Plaintiff seeks indemnification from Universal, but is ineligible under New York law on multiple bases to make a compensable indemnification claim. For example, it cannot legitimately seek indemnification for its alleged breaches of a separate contract to which Universal was not a party, nor is it entitled to indemnification for an unnecessary and voluntary payment in response to the allegations against it.

### Statement of Undisputed Material Facts

1. LBB's home office at the time of the sale and re-sale of this loan in 2006 was in Wilmington, Delaware. (Ex. 1, Boderone Decl., Ex. B, Federal Stock Charter No. 6947, Lehman Brothers Bank, FSB ("Section 2. Office. The home office shall be located in Wilmington, Delaware.").)

2. Between 2005 and 2008, LBB was a member of the Federal Home Loan Bank of Pittsburgh ("FHLB Pittsburgh"). *See, e.g., Federal Home Loan Bank Members*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

*Selected for Community Support Review*, 70 Fed. Reg. 60,083, at 60,084 (Oct. 14, 2005); *Federal Home Loan Bank Members Selected for Community Support Review*, 72 Fed. Reg. 58,088, at 58,089 (Oct. 12, 2007). True and correct copies are attached to this Motion as Composite Ex. 2.

3. The National Information Center, a "repository of financial data and institution characteristics collected by the Federal Reserve System" provides LBB's (subsequently known as Aurora Bank, FSB and, later, Aurora Commercial Corp.) institutional history and indicates that LBB, which had previously been known as Delaware Savings & Loan Association, and then Delaware Savings Bank, FSB, maintained at all relevant times its main office in Delaware. It was not until September 28, 2012 that LBB (then known as Aurora Bank, FSB) moved its main office to Littleton, Colorado. (Boderone Decl., Ex. C.)

4. FDIC records also confirm that as of May 2009, LBB maintained its main office in Wilmington, Delaware. (Boderone Decl., Ex. D.) Further confirmation of Aurora's principal place of business is its own website as of May 27, 2009 showing that its "Headquarters & Executive Offices" were located in Wilmington, Delaware. (Boderone Decl., Ex. E.)

5. An Office of Thrift Supervision document, entitled "Lehman Brothers Bank, FSB, Safety & Soundness/Compliance Examination 2007," dated August 7, 2007, shows that Aurora's main office at that time was Wilmington, Delaware. (Boderone Decl., Ex. F.)

6. On September 20, 2005, Universal and LBB entered into a loan purchase agreement (the "contract" or "Agreement"). The parties entered into an Addendum to the Agreement on October 1, 2006. (Baker Decl.[1] ¶ 4, Ex. 1.)

7. The Agreement is governed by New York law. (Am. Compl., Ex. 1 § 8; Baker Decl., Ex. 1 at 2 § 8.)

8. Universal sold various loans to LBB pursuant to the Agreement and Seller's Guide, including this loan to borrower Horstmann. (Baker Decl. ¶¶ 7, 16; Ans. to Am. Compl. ¶ 19.)

9. LBB purchased the Loan from Universal on December 30, 2005. (Baker Decl. ¶ 16, Ex. 7.)

10. All representations and warranties made by Universal under the Agreement are made "as of the related Purchase Date" for each particular loan. Accordingly, Universal's representations and warranties as to this loan were made as of December 30, 2005. (Baker Decl., Ex. 2 at 67, 71, §§ 701, 703.)

---

[1] This citation refers to the Declaration of John Baker filed in support of Plaintiff's Partial Motion for Summary Judgment.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

11. Plaintiff sold this loan to Freddie Mac on or about February 27, 2006. (Baker Decl.¶ 18.)

12. As a condition of selling the loan to Freddie Mac, Plaintiff necessarily provided all the representations, warranties and confirmations as to data accuracy, completeness, borrower creditworthiness and good standing of the loan required of any seller of any loan to Freddie Mac, as required by the Freddie Mac Single Family Seller/Servicer Guide and Plaintiff's contract with Freddie Mac. (Boderone Decl., Ex. A at 82:24-85:23, 136:2-137:4 and Ex. H; Baker Decl., Ex. 9 at 57-59.)

13. On March 31, 2008, Freddie Mac demanded that Plaintiff make it whole for its losses incurred following foreclosure of the property securing the Loan. Freddie Mac alleged violations by Plaintiff of the parties' Master Commitment contract and/or the Freddie Mac Single Family Seller/Servicer Guide. (Baker Decl. ¶ 19, Ex. 10 at 1, 3.)

14. The loan was foreclosed upon and the underlying collateral was sold by Freddie Mac on May 16, 2008. (Baker Decl. 19, Ex. 10 at 6-8).

15. Plaintiff asserts that, on August 7, 2008, it made Freddie Mac whole via a wire transfer that included payments for several loans, including the Loan at issue in this case. (Baker Decl. ¶ 20.)

16. Plaintiff was not compelled by any court order or decree to pay any amount to Freddie Mac when it demanded indemnification. (Boderone Decl., Ex. A at 93:6-9.)

17. On August 20, 2008, Aurora Loan Services, which Plaintiff identifies as its agent, sent a demand letter to Universal, notifying Universal for the first time of what Aurora claimed were loan defects. (Baker Decl. ¶ 21, Ex. 13.)

18. Plaintiff first filed suit with regard to this loan in March 2011, in the United States District Court for the Southern District of Florida (the "Florida Action"). The Florida Action ended in January 2013 with dismissal of Plaintiff's claims, with leave granted by that federal court to re-file seven of the loans at issue in that case (including this one) as separate lawsuits. (Boderone Decl., Composite Ex. G.)

19. Plaintiff re-filed its claims as to this loan in this Court, and pled that "a substantial part of the events that give rise to the claims occurred in this District," including but not limited to certain events and acts identified in the pleading. (Am. Compl. ¶¶ 11, 12.)

### Additional Details Pertinent to Certain Material Facts

Universal sold LBB, now known as Aurora Commercial Corp., approximately 2000 residential mortgage loans over a period of many years. (Moore Decl.[2] ¶ 3.) One

---

[2] This citation refers to the Declaration of Becky Moore filed in opposition to Plaintiff's Partial Motion for Summary Judgment.

of them was this loan to borrower Horstmann, which Universal funded under LBB's proprietary "No Doc[umentation]" loan program on November 29, 2005. (Moore Decl. ¶ 6.) LBB bought this loan from Universal on December 30, 2005. (Baker Decl, ¶ 16.) Universal made certain representations and warranties about the loan as part of the sale, making those representations and warranties for the time period up to and including December 30, 2005. (Universal's Statement of Material Facts ("SMF") ¶ 10.) Also as part of the sale, Universal immediately transferred to LBB virtually the entirety of Universal's files relating to this loan. (Moore Decl. ¶ 4.) LBB (or its agent, Aurora Loan Services) assumed all responsibility at the time of purchase for "servicing" the loan, which involved maintaining the loan file, collecting and allocating loan payments, and communicating directly with the borrower as needed, among other things. *Id.*

On or about February 27, 2006, Plaintiff re-sold the loan to Freddie Mac (Pl. SMF[3] ¶ 11.) In connection with any sale to Freddie Mac, Plaintiff had to make extensive, independent representations and warranties attesting to, among other things, the high quality of each loan, and the accuracy and completeness of all information that was necessary to be submitted in connection with each loan application and overall loan file. (Boderone Decl., Ex. H) Those included the following, among others:

- That all data and information provided about the loan was true, correct and accurate. (Boderone Decl., Ex. H at FM-LB HOR 2576; Baker Decl., Ex. 8 at 5.)

---

[3] This citation refers to Plaintiff's Statement of Material Facts set forth in its Partial Motion for Summary Judgment.

5

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

- That this was an "investment quality" mortgage, specifically meaning that Freddie Mac should have no reason to expect that the borrower would not repay his debt. (*Id.*, FM-LB HOR 2958.)

- That the "mortgage [was] not in default." (*Id.*, FM-LB HOR 2961.)

- That it had determined that the borrower's credit reputation, credit capacity and collateral were all acceptable. (*Id.*, FM-LB HOR 3248.)

- That it had verified and documented the borrower's payment history. (Baker Decl., Ex. 6 at 6.)

- It was also required on an ongoing basis to immediately notify Freddie Mac in writing if "anything other than a regular monthly principal and interest payment or partial pre-payment" was made by the borrower. (*Id.*, FM-LB HOR 4090, 4092.)

Plaintiff has testified that it was not in the habit of representing and warranting things to Freddie Mac that it had not determined to be true and correct. (Boderone Decl., Ex. A at 127:18-21.) Nevertheless, Freddie Mac more than one year later claimed that Plaintiff had breached the terms of its agreement with Freddie Mac, and that information submitted by Plaintiff as part of the sale was not accurate. (Baker Decl. ¶ 19, Ex. 10 at 1,3) Plaintiff asserts that it ultimately made a payment to Freddie Mac in response to Freddie Mac's allegations (which were made in a letter, but not in any lawsuit). (Baker Decl. ¶¶ 19-20.)

Plaintiff has repeatedly admitted that any payment that was allegedly made on its behalf to Freddie Mac resulted from *Plaintiff's own* alleged breaches of separate representations and warranties, in a separate contract to which Universal was not even

6

a party. (Boderone Decl., Ex. A at 89:25-93:15, 124:11-13 (Q. Well, you made a payment because of an alleged breach by Lehman of a separate contract? A. That's why we made the payment, yes), 124:23-125:9 ("Had we not indemnified Fannie or Freddie then we wouldn't have had a loss"; "since we had sold [the loan] . . . correct, there wouldn't have been a loss if we hadn't indemnified Fannie or Freddie"), 220:12-13 ("Yes. We wouldn't have suffered a loss if we had not breached our agreement with them.").) Plaintiff's designated corporate representative further conceded that the indemnification payment allegedly made on behalf of Plaintiff may simply have been made for political reasons, in order for Plaintiff to maintain a good relationship with Freddie Mac: "I don't know what LBHI was thinking at that time, but I understand that's a pretty common consideration in business generally." (Boderone Decl., Ex. A at 91:18-92:9.) This is critical, inasmuch as Plaintiff has also admitted that "materiality" of a claimed breach to the loss suffered must be considered. (Boderone Decl., Ex. A at 271:23-272:4; see also Baker Decl., Ex. 2 at 85, § 710.)

**Grounds for Summary Judgment**

**1. Statute of Limitations**

**New York Law Controls, and its Borrowing Statute Applies**

The parties agree that the Agreement is governed by New York law. Section 8 of the Agreement states:

> This Agreement and the Seller's Guide shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, except to the extend preempted by Federal law.

(SMF ¶ 7.)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

New York law establishes specific limitation periods for causes of action accruing within the state, but applies a "borrowing statute" for causes of action that accrue outside of New York to nonresidents of New York. In cases accruing outside of New York to nonresidents of that state, the action must be timely under *both* the statute of limitations of New York and the statute of limitations of the jurisdiction where the action accrued:

> ***Cause of action accruing without the state.*** An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. Civ. Prac. Law and Rules ("CPLR") § 202. Notably, New York courts have expressly rejected the notion that section 202 is a conflict of laws principle. In 1999, New York's Court of Appeals ruled that the borrowing statute is not a "choice-of-law question," because choice of law issues are "matter[s] of common law"; instead section 202 is a "Statute of Limitations issue, which is governed by the particular terms of the CPLR." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528, 715 N.E.2d 482, 484 (N.Y. Ct. App. 1999); *see also Ledwith v. Sears Roebuck & Co., Inc.*, 231 A.D.2d 17, 24, 660 N.Y.S.2d 402, 406 (N.Y. App. Div. 1997) (Section 202 "is to be applied as written, without recourse to a conflict of law analysis.").

New York's highest court, the Court of Appeals, has explained that "[w]hen a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the

8

jurisdiction where the cause of action accrued." *Global Fin. Corp.*, 93 N.Y.2d at 528.⁴ A cause of action accrues "at the time and in the place of the injury." *Id.* at 529. In cases where the alleged injury is "purely economic," as it is here, "the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Id.; see also Gorlin v. Bond Richman & Co.*, 706 F.Supp. 236, 240 (S.D.N.Y.1989) (internal citation omitted) ("For purposes of the New York borrowing statute, a cause of action accrues where the injury is sustained. In cases involving economic harm, that place is normally the state of plaintiff's residence.").

Universal sold these loans (and, in doing so, made representations and warranties now claimed to have been incorrect when made) not to this Plaintiff, but to LBB, which had its home office and principal place of business in Delaware (SMF ¶¶ 1-5), and was thus a non-resident for purposes of the borrowing statute.⁵ LBB was neither organized nor incorporated in New York. Instead, LBB was a federally chartered savings association. Under federal law, each federally chartered savings association must designate a home office, *e.g.*, 12 U.S.C. § 1464(d)(1)(A); 12 C.F.R. § 545.91(a), and LBB's home office (at the time of the sale of this loan in 2006) was in Wilmington, Delaware. (*See* SMF ¶ 1.)

The Code of Federal Regulations equates the concepts of "home office" and "principal place of business" for federal savings associations. *See* 12 C.F.R.

---

⁴ *See also Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 651, 948 N.Y. S.2d 24, 30 (N.Y. App. Div. 2012); *Kat House Productions, LLC v. Paul, Hastings, Janofsky & Walker, LLP*, 71 A.D.3d 580, 897 N.Y.S.2d 90, 91 (N.Y. App. Div. 2010).
⁵ A foreign corporation is deemed to be a nonresident even if it is both authorized to do business in New York and has an "extensive presence" in New York. *Verizon Directories Corp. v. Continuum Health Partners, Inc.*, 74 A.D.3d 416, 417, 902 N.Y.S.2d 343 (N.Y. App. Div. 2010) (citing *American Lumbermens Mut. Cas. Co. of Ill. v. Cochrane*, 309 N.Y. 1017, 133 N.E.2d 461 (N.Y. Ct. App. 1956)).

9

§1263.18(b) ("The principal place of business of an institution [including a federal savings association] is the State in which the institution maintains its home office. . ."); see also 12 C.F.R. § 561.39 ("The term principal office means the home office of a savings association established as such in conformity with the laws under which the savings association is organized."). Therefore, Plaintiff's principal place of business was its home office of Delaware.

In addition, between 2005 and 2008, LBB was a member of the Federal Home Loan Bank of Pittsburgh ("FHLB Pittsburgh"). See, e.g., Federal Home Loan Bank Members Selected for Community Support Review, 70 Fed. Reg. 60,083, at 60,084 (Oct. 14, 2005) (identifying Plaintiff formerly known as Lehman Brothers Bank, FSB as being a member of FHLB Pittsburgh); Federal Home Loan Bank Members Selected for Community Support Review, 72 Fed. Reg. 58,088, at 58,089 (Oct. 12, 2007) (same). (SMF ¶ 2.) A federally chartered savings association is permitted to become a member of only the Federal Home Loan Bank responsible for the district that includes the state in which the savings association has its principal place of business. See 12 U.S.C. § 1424(b) ("An institution eligible to become a member under this section may become a member only of, or secure advances from, the Federal Home Loan Bank of the district in which is located the institution's principal place of business...."); see also 12 C.F.R. 1263.18; FHLB Pittsburgh's district includes Delaware, but not New York (Boderone Decl., Ex. I); see also *Lehman Brothers Bank, FSB v. State Bank Comm.*, 937 A.2d 95, 102-04 (Del. 2007) (concluding that LBB was domiciled in Delaware for purposes of Delaware state tax laws because LBB's home office was in Delaware and because LBB was a member of FHLB Pittsburgh). Based

10

on the foregoing, LBB was a non-resident of New York at all relevant times and is subject to the borrowing statute.

Plaintiff states that it acquired from LBB the right to bring this action, and claims that it did so after Universal had already made untrue representations and warranties to LBB. (*See* Baker Decl. ¶ 11.) New York law is clear that for purposes of CPLR 202, simply assigning the claims does "not entitle[] [the assignee] to stand in a better position than that of the assignor." *Portfolio Recovery Associates, LLC v. King*, 14 N.Y.3d 410, 416, 927 N.E.2d 1059, 1061 (N.Y. 2010); *see also Windsearch, Inc. v. Delafrange*, 90 A.D.3d 1223, 1224, 934 N.Y.S.2d 576, 577 (N.Y. App. Div. 2011) (same). Thus, it is LBB's residence at the time of breach that is relevant here.

Plaintiff's claims therefore must be timely under Delaware law (or, if Plaintiff is correct in asserting that the claim accrued here, under Colorado law). Because both Colorado and Delaware have limitations periods of three years for actions on written contracts -- and because the Court is already well acquainted with Colorado law -- Universal will focus herein on Delaware law in applying the borrowing statute to these claims.

**Plaintiff's Claims Are Untimely under Delaware's Statute of Limitations**

Delaware law imposes a three-year statute of limitations for breach of contract actions. 10 Del. Code § 8106; *see also L & R Saunders Assoc. d/b/a Radiology Professionals v. Bank of Am.*, 2012 WL 4479232, at *3 (Del. Super. Sept. 12, 2012) ("A breach of contract claim must be brought *within three years of the breach*.") (emphasis added, citing 10 Del. Code § 8106); *Albert v. Alex. Brown Mgmt. Services, Inc.*, 2005 WL 1594085 (Del. Ch. June 29, 2005).

11

Under Delaware law, the statute of limitations accrues, and begins to run, at the time of the allegedly wrongful act, not at the time that the plaintiff discovers the wrongful act or suffers injury from the wrongful act." This Court has repeatedly held that a cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).[6]

This principle has been applied even to allegations of breached representations and warranties in a lawsuit based, like this one, on a demand for "repurchase" of residential mortgage loans: "Delaware's statute of limitations for contract claims begins to run on the date of the breach, regardless of whether the plaintiff is ignorant of the cause of action. That is established law and not subject to debate. Because representations and warranties about facts pre-existing, or contemporaneous with, a [sale] are to be true and accurate when made, a breach of such representations and warranties occurs on the date of the [sale's] closing and hence the cause of action accrues on that date." *Central Mtg.Co. v. Morgan Stanley Mtg. Cap. Holdings*, 2012 WL 3201139, *17 (Del. Ch., Aug. 7, 2012) (internal quotations omitted), citing, *inter alia*, *SmithKline Beecham Pharms. Co. v. Merck & Co.*, 766 A.2d 442, 450 (Del.2000); *CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *8 (Del. Ch. Jan. 24, 2005)

---

[6] *See also In re Coca-Cola Enterprises, Inc.*, 2007 WL 3122370, at *5 n. 39 (Del. Ch. Oct. 17, 2007) *aff'd sub nom. Int'l Broth. Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008) ("Under Delaware law, a plaintiff's cause of action accrues at the moment of the wrongful act-not when the harmful effects of the act are felt-even if the plaintiff is unaware of the wrong."); *Albert v. Alex. Brown Mgmt. Services, Inc.*, 2005 WL 1594085, at *18 (Del. Ch. June 29, 2005) ("The court reiterates that a claim accrues at the time of the alleged wrongdoing, and not when the plaintiff suffered a loss.").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

(noting that claim for breach of representations and warranties accrued on the date of the contract's closing).

*Central Mtg. Co.* also emphatically rejects any notion that a claim did not accrue here until after Freddie Mac demanded indemnification by Plaintiff, or until Plaintiff made an indemnification payment. The Delaware Court of Chancery stated that, "[e]ssentially, [the plaintiff] wishes to have me hold that a breach of contract occurs not at closing, but when the plaintiff first perceives the injury (*i.e.*, when the Agencies put back a loan [i.e., demand indemnification]). Its argument is thus with Delaware law and Delaware law is settled." (2012 WL 3201139, *21). Holding that the time of breach is the time at which an allegedly false representation and warranty was made, the court observed that "[s]tatutes of limitations are enacted to require plaintiffs to use diligence in bringing suits so that defendants are not prejudiced by undue delay, in recognition of the fact that memories fade and information goes stale. Stale claims pose an obvious threat to doing real justice, as any trial judge knows." (*Id.*)

Also reaching the same conclusion, incidentally, was another federal court that had before it a case involving this same Plaintiff and this same form Agreement and related LBB/Aurora Seller's Guide. *Lehman Brothers Holdings, Inc. v. Evergreen Moneysource Mortgage Company*, 793 F.Supp.2d 1189, 1193-94 (W.D. Wash. 2011) held that Plaintiff's claims were barred by the statute of limitations because the date on which loan seller makes representations and warranties controls for limitations purposes, and the right to demand repurchase "is only triggered by 'a breach of any of the representations, warranties, or covenants contained in Section 700 through 710 herein...'").

13

Therefore, the alleged wrongful acts occurred at the time of Universal's sale of this Loan to LBB. The sale indisputably occurred in June 2006 -- five years before Plaintiff filed its first pleading in the Florida Action, and almost seven years before it filed suit in this Court. The statute of limitations thus began to run in 2006 and expired in 2009. Accordingly, Plaintiff's suit is untimely and barred by Delaware's statute of limitations, to which reference is required by New York's borrowing statute.

### 2. Admitted Lack of Causation Means No Liability

In deposition testimony, Plaintiff has made a series of devastating admissions about what caused its "loss" on the Horstmann loan. Its alleged loss consists of an unsubstantiated indemnification payment that it allegedly made to Freddie Mac. Repeatedly during Plaintiff's deposition, Plaintiff admitted that any payment that was allegedly made on its behalf to Freddie Mac resulted from *Plaintiff's own* alleged breaches of separate representations and warranties, in a separate contract to which Universal was not even a party. (Boderone Decl., Ex. A at 89:25-93:15, 124:11-13 (Q. Well, you made a payment because of an alleged breach by Lehman of a separate contract? A. That's why we made the payment, yes), 124:23-125:9 ("Had we not indemnified Fannie or Freddie then we wouldn't have had a loss"; "since we had sold [the loan] . . . correct, there wouldn't have been a loss if we hadn't indemnified Fannie or Freddie"), 220:12-13 ("Yes. We wouldn't have suffered a loss if we had not breached our agreement with them.").)

Moreover, multiple alleged "violations" by Universal now asserted by Plaintiff plainly had nothing to do with Freddie Mac's demand for payment from Plaintiff -- a demand that alleged violations by Plaintiff of terms and conditions of the separate

14

contract between Plaintiff and Freddie Mac. (Baker Decl., Ex. 10 at 1, 3; Baker Decl., ¶¶ 24, 26.) Plaintiff's designated corporate representative further conceded that the indemnification payment allegedly made on behalf of Plaintiff may simply have been made for political reasons, in order for Plaintiff to maintain a good relationship with Freddie Mac: "I don't know what LBHI was thinking at that time, but I understand that's a pretty common consideration in business generally." (Boderone Decl., Ex. A at 91:18-92:9.)

These admissions are devastating because one of the indispensable elements of any breach of contract claim under governing New York law is "resulting damage." (*See, e.g.*, Pl. MSJ, 8; *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y. App. Div. 2009); *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999)). Likewise, the very contract provision (section 711 of the Aurora Seller's Guide) that Plaintiff purports to be "enforcing" in its demand for indemnification clearly requires proof of a causal connection. Under the contract, indemnification is to be paid for losses "related to or resulting from" a breach <u>by Universal</u>. (Baker Decl., Ex. 2 at 86-87, § 711.)

New York case law emphasizing the importance of establishing a direct causal relationship between a purported breach and a resulting financial loss is in heavy supply. "It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach." *Pesa v. Yoma Development Group, Inc.*, 18 N.Y.3d 527, 532 (2012). "The causation argument begins with the established principle that, to recover damages for breach of contract, a plaintiff must show, first, that its damages were actually caused by the alleged breach . . .". *In re: Residential Capital,*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

*LLC, et al.*, No. 12-12020 (MG), 2013 WL 412927, at *24 (S.D.N.Y. Feb. 1, 2013) (case involving mortgage repurchase claims).

The Second Circuit held in *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525-26 (2d Cir. 2004) that "[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately* caused his or her damages... Moreover, damages 'may be so remote as not to be directly traceable to the breach, or they may be the result of *other intervening causes*, and then they cannot be allowed.'") (citation omitted, emphasis original); E. Allan Farnsworth, CONTRACTS (3d ed. 2004), § 12.1, at 150 ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss.")

When a party has failed to come forward with evidence sufficient to demonstrate damages flowing directly from the breach alleged, dismissal of the breach of contract claim is in order. *Lexington 360 Associates v. First Union National Bank of North Carolina*, 234 A.D.2d 187, 189-90 (N.Y. App. Div. 1996); *Leigh Management Associates v. Weinstein*, 251 A.D. 2d 225, 226 (N.Y. App. Div. 1998) (judgment for defendant as a matter of law where claim did not demonstrate a causal relationship between the purported conduct and any damages suffered by the plaintiff).

By virtue of its string of admissions that its loss was occasioned by Freddie Mac's allegation that Plaintiff breached distinct provisions of a distinct contract, and that Plaintiff's loss resulted simply from its payment related to that allegation, Plaintiff fails to satisfy the basic elements for a claim of breach of contract.

### 3. **Plaintiff Does Not Qualify for "Indemnification" in these Circumstances**

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

LBHI does not claim to have repurchased the Horstmann loan, but instead claims to have made an indemnification payment. (Boderone Decl., Ex. A at 77:6-16.) It admits that, because the mortgage has been liquidated, there really is nothing that Universal could "repurchase" here anyway. (*Id.*, 59:21-60:6.) LBHI is thus seeking an indemnification payment from Universal. If LBHI did actually indemnify Freddie Mac (which has certainly not been proven), its failures to take certain steps as part of that indemnification process create another insurmountable barrier under **New York** law for its claim.

Under **New York** law, in order to receive indemnification, the indemnitee must establish that the indemnitee would have actually been liable for the underlying claim, that there was no good defense, and that the settlement amount was reasonable. *Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 299 (N.Y. App. Div. 1959); *see also Tokio Marine v. Macready*, 803 F. Supp.2d 193, 202 (E.D.N.Y. 2011); *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 222-23 (S.D.N.Y. 2010).

Here, LBHI admits that it was not compelled by any court order or decree to pay any amount to Freddie Mac when it demanded indemnification. (SMF ¶ 16.) No lawsuit had even been filed against it (or even threatened), and, as is documented in Universal's opposition to Plaintiff's pending motion for summary judgment, Freddie Mac's assertions were in each instance either inaccurate or immaterial to this type of loan product. (Universal Opp. to Pl. MSJ at 10-12.) Indeed, as Plaintiff has conceded, the payment may simply have been "political" in nature (designed to keep LBHI in the good graces of Freddie Mac, an important business partner). (Boderone Decl., Ex. A at 91:18-92:9.)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

In New York, an indemnitee has no right to seek indemnification for payments it made voluntarily and was under no legal obligation to make. *See Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 339, 350 (S.D.N.Y. 2010); *MPM Silicones, LLC v. Union Carbide Corp.*, No.1:11-CV-1542 (LEK/ATB), 2013 WL 1106731, at *16 (N.D. N.Y., March 18, 2013). An indemnitor is not liable to an indemnitee unless the indemnitee was legally bound to pay a third party. *See Reliance Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 243 A.D.2d 456, 457 (2d Dep't 1997) (finding that plaintiff was a "mere volunteer or intermeddler" with "no right to seek indemnification for a loss it was not obligated to pay in the first instance"); *Jemal v. Lucky Ins. Co.*, 260 A.D.2d 352, 352 (N.Y. App. Div. 1999) (when a party voluntarily settles a claim, he must demonstrate as a factual matter that he was legally liable to the party whom he paid, and that the amount of settlement was reasonable in order to recover against an indemnitor). An indemnitor is liable only for claims which the indemnitee was obligated to pay and not for claims paid by the indemnitee as, in essence, a volunteer. *Rosco Trading Co. v. W.M. Pringle & Co.*, 182 N.Y.S. 290, 292-93 (N.Y. App. Term. 1920).

Not only did LBHI make payments it was not legally required to make, LBHI's representations and warranties were independent from those of Universal to LBHI, so LBHI's decision to indemnify Freddie Mac does not create an obligation for Universal to indemnify LBHI. *See, e.g., Twitchell v. Town of Pittsford*, 483 N.Y.S.2d 524, 526 (N.Y. App. Div. 1984).

Moreover, indemnity provisions will not be construed to indemnify a party against his own negligence or misrepresentations <u>unless such intention is expressed in</u>

18

unequivocal terms. *Id.*; *Taussig v. Clipper Group, L.P.*, 13 A.D.3d 166, 167 (N.Y. App. Div. 2004). Here, the parties' contract nowhere establishes any such sweeping, unequivocal intention.

Also, under New York law, when the putative indemnitee (Plaintiff) fails to notify the indemnitor (Universal) that it is making a payment for which it will expect reimbursement, the indemnitee proceeds at its own risk with regard to that payment. *Feuer*, 8 A.D.2d 294 at 299.

Plaintiff's claim, under all these circumstances, for "indemnification" falls far short of what is required in order to prevail on an indemnification claim under New York law, and entitles Universal to summary judgment on this basis as well.

For all the foregoing reasons, and on the authorities cited, Universal requests that summary judgment be granted in its favor as to all claims.

                        Respectfully submitted,

By: /s/Philip R. Stein
Philip R. Stein, Esq. (Florida Bar No. 67278)
pstein@bilzin.com
Enza G. Boderone, Esq. (Florida Bar No. 0792411)
eboderone@bilzin.com
BILZIN SUMBERG BAENA PRICE
& AXELROD LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

-and-

Marisa C. Ala, Esq. (#38693)
PALUMBO BERGSTROM LLP
8375 South Willow Street, Suite 300
Lone Tree, CO 80124
Tel/Fax: (303) 694-0561
mala@palumbolawyers.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was served on counsel for Lehman Brothers Holdings, Inc. via ECF this 26th day of November, 2013:

FOSTER GRAHAM MILSTEIN & CALISHER, LLP
Christopher P. Carrington
carrington@fostergraham.com
360 S. Garfield Street, 6th Floor
Denver, Colorado 80209

/s/Enza G. Boderone
Enza G. Boderone, Esq.

MIAMI 3947305.2 72743/35700

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456