UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

CASE NO. 1:13-CV-00090-PAB-MJW

LEHMAN BROTHERS HOLDINGS, INC.,

    Plaintiff,

v.                                                  **(Oral Argument Requested)**

UNIVERSAL AMERICAN MORTGAGE
COMPANY, LLC,

    Defendant.

---

## UNIVERSAL'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT [D.E. # 53]

---

In its opposition memorandum, Lehman Brothers Holdings, Inc. ("Plaintiff" or "LBHI") offers no legitimate basis for denying summary judgment to Universal American Mortgage Company ("Universal"). To the contrary, Plaintiff wholly ignores dispositive facts, such as its many sworn testimonial admissions that no purported "breach" by Universal caused any loss that Plaintiff suffered, and its admissions that any payment Plaintiff made to Freddie Mac was likely voluntary and "political" in nature. Instead, Plaintiff chooses to make legal arguments that are, in every instance, simply inaccurate and/or inapposite. Indeed, just days after Plaintiff filed its opposition brief, a New York appellate court issued a much-anticipated decision vindicating a key argument made in this case by Universal, and rejecting one of Plaintiff's central contentions. The appeals court held that a claim for repurchase or indemnification of a mortgage loan accrues at the time the loan is sold to the plaintiff, not when the plaintiff decides to pay a

subsequent purchaser in response to that subsequent purchaser's request for repurchase or indemnification. That new decision, discussed below, does away with the entirety of "Part B" of Plaintiff's opposition in one fell swoop. Parts "A" and "C" fare no better when scrutinized.

## Reply Concerning Undisputed Facts

Plaintiff disputes none of the facts cited by Universal as undisputed. To the extent that Plaintiff in a few instances offers "denials" to Universal's statement of undisputed facts, those denials appear to be primarily directed to well-established statements of law discussed in Universal's motion.

## When the Limitations Period Began to Run

A New York appellate court on December 19, 2013 provided its answer to the critical question of when the statute of limitations for mortgage buyback claims begins to run, doing so in a $330 million suit accusing a Deutsche Bank AG affiliate of making false statements about the quality of loans underlying its mortgage-backed securities.

The New York Appellate Division unanimously reversed a lower court's May 14, 2013 decision in *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 40 Misc. 3d 562 (Sup. Ct. N.Y. Cnty. 2013). (Resp.,[1] 19-21.) The Appellate Division held that the statute of limitations for mortgage put-back claims begins to run on the date when the representations and warranties were made, rather than the later date on which the alleged "failure to repurchase" occurred. *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 2013 WL 6670379 (N.Y.A.D. 1 Dept., Dec. 19, 2013).

---

[1] This citation refers to Plaintiff's Response to UAMC's Motion for Summary Judgment [D.E. #60].

2

Specifically, the Appellate Division held that "[t]he motion court erred in finding that plaintiff's claims did not accrue until defendant either failed to timely cure or repurchase a defective mortgage loan. To the contrary, the claims accrued on the closing date of the [Master Loan Purchase Agreement], March 28, 2006, when any breach of the representations and warranties contained therein occurred." *Id.* at *1, citing *Ely-Cruikshank Co. v Bank of Montreal,* 81 NY2d 399, 402 (1993); *Varo, Inc. v Alvis PLC*, 261 AD2d 262, 267-268 (1st Dept 1999), *lv denied* 95 NY2d 767 (2000).

*Ace Securities* comes on the heels of a similar holding in *Nomura Asset Acceptance Corp., etc. v. Nomura Credit & Capital, Inc.*, 39 Misc. 3d 1226(A), 2013 WL 2072817 (Sup. Ct. N.Y. Cty. May 10, 2013). It also aligns with prevailing federal case law, which holds that under New York law, the statute of limitations begins to run at the time that the allegedly false statement was made, and not years later when a plaintiff makes a demand to repurchase. *See Lehman Bros. Holdings, Inc. v. Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189 (W.D. Wash. 2011); *Structured Mortg. Trust 1997-2 v. Daiwa Fin. Corp.*, No. 02 Civ. 3232 (SHS), 2003 WL 548868 (S.D.N.Y. Feb. 25, 2003).

Plaintiff's affiliate Lehman Brothers Bank, FSB ("LBB") bought this loan from Universal on December 30, 2005. (SMF[2] ¶ 9, at 3.) Universal made its representations and warranties as of that date. Irrefutably, Plaintiff did not file suit within the three-year limitations period applicable to this claim under New York's borrowing statute.

### The Borrowing Statute is not a "Conflict of Law Principle"

---

[2] This citation refers to Universal's Statement of Material Facts set forth in its Motion for Summary Judgment.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Plaintiff gamely tries to make the case that the "borrowing statute" portion of New York's statute of limitations has somehow been written out of the parties' agreement. (Resp., 4-5.) The argument is that, by not giving effect to "principles of conflict of laws," the parties intended to, and did in fact, preclude application of the borrowing statute to their agreement. There are several insurmountable problems with that argument. First, New York's statute of limitations (including the borrowing statute) is a *statute*, not a *principle*. Second, that statute is not in any way in "conflict" with any other competing statute; to the contrary, this is a single, unified statute that expressly provides for the operation of a shorter limitations period (that of the state of the home office of a non-resident plaintiff) in certain types of circumstances.[3] Thus, Plaintiff's true objection is to the clear terms of that single, unified statute (which plainly does not serve its interests in this instance), not to some imagined "conflict" among "principles" governing when a court should look to the laws of another state.

Third, Plaintiff's case and statutory citations (Resp., 4) do nothing to establish the borrowing statute, CPLR § 202, as a "principle of conflict of laws." *In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740, 810 (E.D.N.Y.1984) is not instructive, because it merely characterizes the statute, without further analysis or application, as a "special conflict of laws provision applicable to causes of action accruing without the state" without any support or explanation. No New York court has described the statute

---

[3] Surely Plaintiff would not argue that the borrowing statute was a "conflicts of law principle" if it simply identified a shorter time period within which a claim must be brought whenever certain circumstances are in play. The borrowing statute, by expressly directing the reader to find the pertinent number of years by looking at a particular state's statute of limitations, accomplishes exactly the same thing by slightly different means. Moreover, it is difficult to conceive of how there is a "conflict of laws" when one state, by statute, expressly defers to the limitations period of another state.

in that fashion in the 30 years since that passing reference in *Agent Orange*. To the contrary, 13 years later, a New York court said just the opposite. *Ledwith v. Sears Roebuck & Co., Inc.*, 231 A.D.2d 17, 24, 660 N.Y.S.2d 402, 406 (N.Y. App. Div. 1997) (CPLR 202 "is to be applied as written, without recourse to a conflict of law analysis."). *Ledwith* is also significant because it rejects the principle of *renvoi*, the subject of another errant argument by Plaintiff in its response brief. (Resp., 11-12.) The New York appellate court stated:

> By its own terms, CPLR 202's borrowing provision is not confined to the Statute of Limitations but embraces all the laws that serve to limit the time within which an action may be brought, and consistent with that rationale, courts have refused to apply renvoi, the choice of law principle relied upon by the hearing court, to circumvent CPLR 202. Were the rule otherwise, courts could choose, where favorable, New York's Statute of Limitations over the shorter limitation period of the lex loci, whereas CPLR 202, **which is to be applied as written, without recourse to a conflict of law analysis, mandates application of the shorter of the two.**

*Id.* at 18 (emphasis added). Ignoring this very clear direction from a New York court specifically analyzing and applying the statute at issue, Plaintiff instead directs the Court's attention to *IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A.*, 20 N.Y.3d 310, 982 N.E.2d 609, 958 N.Y.S.2d 689 (N.Y. 2012), a case that has nothing at all to do with the borrowing statute. (Resp., 5.) That case holds that a conflict-of-laws analysis must not be undertaken when there is an express choice of New York law in the contract, but, as *Ledwith* makes clear, the borrowing statute is a New York statute that is to be applied as written; indeed, it permits no "recourse to a conflict of law analysis."

Likewise, both *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1220 (10th Cir.1997) and *Vandeventer v. Four Corners Elec. Co., Inc.* 663 F.2d 1016, 1017 (10th Cir. 1981)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

(addressing Colorado's borrowing statute), also cited by Plaintiff (Resp., 4), are not applicable because they do not even address whether New York's borrowing statute is a conflicts of law provision. It is also unclear why Plaintiff cites to a Colorado statute, C.R.S. § 13-82-103, to argue that New York's borrowing statute is a conflict of law provision. In any event, C.R.S. § 13-82-103 is a definitional provision that does not address Colorado's statute of limitations. C.R.S. § 13-82-104 pertains to Colorado limitation periods, but this provision has been repealed.

### The Borrowing Statute Applies Here

Disregarding an extensive history of LBB's repeated identifications of Delaware as its home office and principal place of business (*see* Motion, 2-3), and also disregarding a federal law that defines how the principal place of business is determined for <u>federal savings banks</u> such as LBB (see Motion, 9-10), Plaintiff attempts to retroactively identify LBB as a New York resident to which the borrowing statute does not apply. The attempt is ill-conceived.

Plaintiff wrongly states that "UAMC's position has been squarely rejected: For purposes of CPLR 202, an entity is not limited to its home office or place of incorporation and, instead, can have more than one residence." (Resp., 8.) It further claims that the real issue in this case is "whether a plaintiff with a principal place of business in New York but incorporated in Delaware could be a 'resident' of New York for purposes of New York's borrowing statute." (*Id.*) Not only is that not the pertinent question under the borrowing statute, but the premise is false, in that, by its own repeated reports, LBB cannot properly be regarded as having its principal place of business in New York. Plaintiff's flawed argument relies heavily on the case *of In re*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

*Countrywide Financial Corp. Mortgaged-Backed Securities Litigation*, 834 F.Supp.2d 949 (C.D.Cal. 2012) (discussed, Resp, 8-10).

In its analysis of that case, Plaintiff incorrectly equates "home office" to "place of incorporation." (Resp., ¶ 1at 2, *see also* 8.) As detailed in Universal's motion, the "home office" is defined as a federal savings bank's *principal place of business*. (Motion, 10.) Accordingly, the issue in this case is not as framed by Plaintiff, but whether LBB, which had its principal place of business and home office (and, for that matter, place of incorporation) in Delaware, should nevertheless be deemed a resident of New York. While an entity may conceivably have more than one residence, *In re Countrywide* did not hold that an entity can be deemed a resident of a place that is neither its place of incorporation nor principal place of business.

The defendants in *In re Countrywide* claimed that a corporation is a resident, for purposes of the borrowing statute, only of the state in which it is incorporated. *Id.* at 956. The plaintiffs argued that a corporation is a resident, under the borrowing statute, of the state in which it has its principal place of business. *Id.* The district court found two cases to be especially helpful in reaching its decision: *Wydallis v. U.S. Fidelity & Guar. Co.*, 482 N.Y.S.2d 472 (1984), and *Antone v. General Motors Corp., Buick Motor Div.*, 484 N.Y.S.2d 514 (1984). *Wydallis* held that "a New York corporation with its principal place of business in Massachusetts was a New York resident for purposes of the borrowing statute." *Antone* involved a natural person and held that the test for residency under the borrowing statute was "whether the plaintiff has a residence in New York" or whether "he has a significant connection with some locality" in New York. *Id.* at 956-57.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Applying *Antone* to the plaintiffs, the district court determined that under the borrowing statute's residency requirement, a plaintiff could have more than one residence. *Id.* at 958. The court also held that the <u>establishment of a principal place of business in New York</u> is a significant connection to New York and is sufficient to qualify a corporation as a New York resident. *Id.* Thus, the district court ruled that the borrowing statute does not apply if a plaintiff is either incorporated in New York or maintains its principal place of business in New York. *Id.* Here, because LBB was a federal savings bank incorporated in Delaware with its principal place of business in Delaware, the Court must find, based on *In Re Countrywide* and the authorities cited in the motion, that LBB was a resident of Delaware.[4]

**<u>Plaintiff's Misreading of *Lehman Brothers Bank, FSB v. State Bank Comm.*</u>**

Challenging this case cited in Universal's motion, Plaintiff claims that the court observed that LBB's commercial domicile was New York (Resp. 10). But the court made no such finding. It simply acknowledged that LBB argued a commercial domicile different from that held by the Delaware court, and that the argument was based on definitions extracted "either from dictionaries or from regulations that are not applicable in Delaware: the Uniform Division of Income for Tax Purposes Act (UDITPA) and a

---

[4] Plaintiff tries to invoke a rarely used exception to CPLR 202, the financial base exception, by citing in a footnote (FN 6) to a single case. Plaintiff argues that the Court should find that LBB's place of injury was New York because its financial accounts were allegedly maintained in New York. (Resp., 9.) But, as documented in Universal's motion, the place of economic injury is where the entity has its principal place of business. Economic injury is said to occur in a location other than where the plaintiff resides only in "extremely rare case[s] where the party has offered unusual circumstances." *Robb Evans & Assocs. LLC v. Sun America Life Ins.*, 2012 WL 488257, at *4 (S.D.N.Y. Feb. 14, 2012) (quoting *Baena v. Woori Bank*, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006)); *Deutsche Zentral-Genossenchaftsbank AG v. HSBC North America Holdings, Inc.*, 2013 WL 6667601, 5 (S.D.N.Y. 2013).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Model Statute adopted by the Multistate Tax Commission (MTC). Delaware has not adopted the UDITPA and is not a member of the MTC." *Lehman Brothers Bank, FSB v. State Bank Comm.*, 937 A.2d 95, 103 fn.19 (Del. 2007) ("The Bank argues that in interpreting the statute, the terms 'principal office' and 'headquarter[s]' must be given their ordinary meaning. According to the Bank, the ordinary meaning is 'commercial domicile,' defined as 'the place from which the trade or business is principally managed or directed.'"). So Plaintiff is trying to pass off an argument noted by a court as a holding of that court when in fact the court held that under the Code of Federal Regulations, LBB was domiciled in Delaware. *Id.* at 103-104. Indeed, LBHI conveniently ignores the Code of Federal Regulations provision cited by the Delaware court as well as Universal in its motion that specifically defines a federal savings bank's principal place of business.

## *Renvoi* Arguments Do Not Apply

As stated above, the *Ledwith* court in New York rejected the application of *renvoi*, stating that it cannot circumvent the application of the borrowing statute, CPLR 202. Plaintiff nevertheless asks this Court to conclude that *renvoi* will result if New York's borrowing statute is applied. (Resp., 11-12.) In doing so, it misstates the application of Delaware law. Plaintiff claims that Delaware law requires the use of Colorado's limitation period, citing to two cases, *American Energy Technologies* and *In re Winstar Communications*. (Resp., 11.) However, these cases are not applicable here, because this case is not before a Delaware court. If it were, then the Court would have to analyze whether Plaintiff's claim is timely under the shorter of the time limited by Delaware law or the time limited by the law of the state where the cause of action arose.

9

*See* 10 De. C. 8121 (Delaware's borrowing statute)[5]; *American Energy*, 1999 WL 301628 at, *2; *see also In re Winstar Communications, Inc.*, 435 B.R. at 44.

This action is not before a Delaware court; therefore, the Delaware borrowing statute is inapplicable. Delaware's three-year statute of limitations therefore applies. *See e.g., Potter v. Arrington*, 11 Misc.3d 962, 969-970, 810 N.Y.S.2d 312, 318 (N.Y.Sup. 2006) (finding that in applying the borrowing statute to a non-resident of New York, for claims that accrued in Delaware, the application of Delaware's three-year statute of limitations is appropriate).

### Plaintiff's Inability to Satisfy Causation and Indemnification Requirements

As documented in Universal's motion, Plaintiff freely and repeatedly admitted in deposition testimony to a lack of any causal connection between the alleged "loan defects" and the loss allegedly suffered by Plaintiff. (Motion, 5-7, 14-15.) Moreover, it cannot legitimately seek indemnification for its own alleged breaches of a separate contract to which Universal was not a party, nor is it entitled to indemnification for what it conceded was a voluntary, and likely "political," payment in response to the allegations against it.

Wholly ignoring its own admissions, Plaintiff claims that "causation is not as rigid under New York law as [Universal] would have the Court believe," relying on two cases for its position -- *Assured Guaranty Muni* and *Syncora Guarantee*. (Resp., 23

---

[5] 10 Del. C. 8121 provides:

Where a cause of action arises outside of this State, **an action cannot be brought in a court of this State to enforce such a cause of action after the expiration of whichever is shorter,** the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. (Emphasis added.)

10

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

incorporating arguments set forth in D.E. #55 at 9.) First of all, those cases pertained to the nature of mortgage *insurance* contracts (and insurance contracts generally), not mortgage *sale* contracts like the one at issue. The distinction is important because, as the courts in those cases observed, the insurance marketplace is one in which assessing *risk of loss* is, in essence, the whole ballgame; thus, a mere increase in the risk of loss constitutes a material and adverse effect on the insurer. *See Syncora,* 2012 WL 2326068, at *4. Accordingly, the core issue in those cases was what *type of damage* needed to be demonstrated by an insurer: an actual loss or merely an increase in the risk of loss. The case before this Court, by contrast, presents an entirely different question: whether a payment allegedly made by Plaintiff to Freddie Mac, based on Freddie Mac's assertions that Plaintiff breached its own separate and independent representations and warranties in a separate contract to which Universal was not a party, can legally be said to have been "caused" by Universal (and whether Plaintiff is to be indemnified for its own alleged breaches). Given that Plaintiff cannot simply run from its own testimonial admissions of a total lack of causation, that question has either been answered in the negative, or rendered moot in this instance.

On the issue of what is required to present a compensable indemnification claim, Plaintiff likewise diverges from the pertinent circumstances. It myopically focuses on *Feuer v. Menkes Feuer* and mischaracterizes its holding by stating that it "turned on the fact that the parties' contract required that plaintiff notify defendant of indemnification claims and, when plaintiff failed to do so, plaintiff was required to establish the reasonableness of the settlement." (Resp., 24.) In fact, the *Feuer* court held that if an indemnitee fails to notify the indemnitor of a claim, the indemnitee must still establish

11

that the indemnitor would have been liable and that the amount paid in settlement was a reasonable amount and entered into in good faith, even in the absence of a contractual duty to provide notice,. *Id.* at 298-99. Plaintiff has failed to make any such showing, nor has it offered any evidence from which such a finding could be made.

In any event, Section 710 of the Seller's Guide requires the purchaser (Plaintiff) to provide notification of the breach, at which time the seller can either cure or repurchase/provide indemnification. And this case involves separate and distinct breaches of representations and warranties made by Plaintiff, avowedly based on its own investigation, validation and personal knowledge of all details pertinent to the loan sold to Freddie Mac at the time of the sale. It is also undeniable that Plaintiff provided no notice whatsoever to Universal of any purported defects until after Plaintiff allegedly made the voluntary payment that constitutes its claimed "loss." Nevertheless, Plaintiff complains that "UAMC takes too narrow of a view of what it means to be 'legally bound' to pay a claim" (Resp., 24), and takes the untenable position that it should be entitled to indemnification for making payments to Freddie Mac simply for "political reasons."

For all the foregoing reasons, and on the authorities cited, Universal requests that summary judgment be granted in its favor as to all claims.

Respectfully submitted,

By: /s/Philip R. Stein
Philip R. Stein, Esq.
(Florida Bar No. 67278)
pstein@bilzin.com
Enza G. Boderone, Esq.
(Florida Bar No. 0792411)
eboderone@bilzin.com
BILZIN SUMBERG BAENA PRICE
& AXELROD LLP
1450 Brickell Avenue, Suite 2300

Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593

-and-

Marisa C. Ala, Esq. (#38693)
PALUMBO BERGSTROM LLP
8375 South Willow Street, Suite 300
Lone Tree, CO 80124
Tel/Fax: (303) 694-0561
mala@palumbolawyers.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was served on counsel for Lehman Brothers Holdings, Inc. via ECF this 3rd day of January, 2014:

FOSTER GRAHAM MILSTEIN & CALISHER, LLP
Christopher P. Carrington
carrington@fostergraham.com
360 S. Garfield Street, 6th Floor
Denver, Colorado 80209

/s/Enza G. Boderone
Enza G. Boderone, Esq.

MIAMI 3987789.2 72743/42304