IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00090-PAB-MJW

LEHMAN BROTHERS HOLDINGS INC.,

     Plaintiff,

v.

UNIVERSAL AMERICAN MORTGAGE COMPANY, LLC,

     Defendant.

---

## ORDER

---

     This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [Docket No. 47] filed by plaintiff Lehman Brothers Holdings, Inc. ("LBHI") and Universal's Motion for Summary Judgment [Docket No. 53] filed by defendant Universal American Mortgage Company, LLC ("Universal"). This matter arises out of defendant's sale of a mortgage loan to Lehman Brothers Bank, FSB ("LBB") in 2005. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND

     The following facts are undisputed. LBB (subsequently known as Aurora Commercial Corporation and now as Aurora Bank, FSB) was a federal savings bank chartered in June 1999 under Section 5 of the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq*. Docket No. 53-3 at 2. From 2005 through 2008, LBB was a member of the Federal Home Loan Bank ("FHLB") of Pittsburgh. Docket No. 53 at 2, ¶ 2; Docket No. 60 at 2. In 2006, LBB's home office was in Wilmington, Delaware. Docket No. 53

at 2, ¶ 1; Docket No. 60 at 2, ¶ 1.  In September 2012, LBB moved its home office to Littleton, Colorado.  Docket No. 53 at 3, ¶ 3; Docket No. 60 at 2, ¶ 3.

On September 20, 2005, defendant and LBB entered into a loan purchase agreement (the "Agreement"); the parties entered into an addendum to the Agreement on October 1, 2006.  Docket No. 53 at 3, ¶ 6; Docket No. 60 at 2.  The Agreement is governed by the laws of New York State:

> This Agreement and the [Aurora Loan Services, LLC] Seller's Guide shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, except to the extent preempted by Federal law.

Docket No. 53 at 3, ¶ 7; Docket No. 60 at 2; Docket No. 7-1 (Loan Purchase Agreement) at 3, § 8.  The Agreement incorporates the Aurora Loan Services, LLC[1] Seller's Guide (the "Seller's Guide"), which provides that the Agreement "shall be construed in accordance with the substantive law of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such law without regard for the principles of conflict of laws."  Docket No. 7-3 at 47, § 713.1.

Defendant sold a number of loans to LBB pursuant to the Agreement, including Loan 5128 to Lisa Horstmann, which LBB purchased on December 30, 2005.  Docket No. 53 at 3, ¶¶ 8-9; Docket No. 60 at 2; Docket No. 1 at 5, ¶ 17.  Loan 5128 was

---

[1]Aurora Loan Services, LLC ("Aurora Loan Services") is the administrative agent for LBB's "Conduit Program," which was a "secondary market program for the Purchase by [LBB] of non-conforming Mortgage Loan products which, due to either loan amount or other parameters, are generally ineligible for sale to" the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association.  Docket No. 7-2 at 3, § 100.

originated under plaintiff's guidelines for a "No Doc[umentation]" loan, meaning that the borrower's income, employment, and assets were not disclosed to defendant and defendant did not calculate the ratio of her debt to her income.  Docket No. 48 at 8; Docket No. 48-4 at 63; Docket No. 47-4 at 5; Docket No. 7-2 at 48-49.  On the loan application, the borrower stated that the property securing the loan was intended as an investment property.  Docket No. 47 at 5, ¶ 16; Docket No. 48 at 18, ¶ 16.

The Seller's Guide, which is a part of the Agreement between the parties, defines "investment property" as a "dwelling occupied or intended to be occupied by someone other than the borrower."  Docket No. 7-2 at 19, § 501.2-3.   It states that "[f]inancing for investment properties is available for those borrowers who have experience as a landlord."  *Id*.  With respect to loans for investment property, it provides that underwriting "will take into consideration the number of properties owned and the length of time the properties have been owned" and "reserves the right to request documentation to evidence the borrower had the funds required to purchase any property acquired within the last 24 months and/or sufficient verified assets to provide adequate reserves for the investment portfolio."  *Id*. at 20, § 501.5.  In the case of a borrower seeking financing for an investment property, the "file must contain evidence the borrower has sufficient experience to handle the entire investment portfolio."  *Id*.  A borrower who has owned a primary home for less than two years is not eligible for investment property financing.  *Id*. at 21.

Aurora Loan Services "Mortgage Maker" guidelines indicates that a "First Time homebuyer"–that is, a borrower who has not "owned a property within the last three

years **or one who has not owned their first home for at least 12 months**" is eligible for a No Doc loan if his or her file contains canceled checks for the past year indicating no late rental payments.  Docket No. 48-4 at 68 (emphasis in original).  First Time homebuyers are not eligible for investment property financing.  *Id*.

The Seller's Guide states that, "[u]nless otherwise stipulated in the applicable Program Profile, files should contain verification of the borrower's 12-month payment history for all mortgages appearing on the credit report and initial application."  Docket No. 7-2 at 38, § 504.2-11.

The Seller's Guide states that "[n]o document, report or material furnished to Purchaser in any Mortgage Loan File or related to any Mortgage Loan . . . was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading."  Docket No. 7-3 at 31, § 703(1).  Pursuant to the Seller's Guide, defendant made all "representations, warranties, and covenants" with respect to the sale of Loan 5128 on the day LBB purchased the loan.  Docket No. 53 at 3, ¶ 10; Docket No. 60 at 2; Docket No. 1-3 at 27, § 701.

On the application for Loan 5128, the borrower stated that she had owned her primary residence for four years.  Docket No. 47 at 5, ¶ 16; Docket No. 48 at 18, ¶ 16.  Public records indicate that the borrower had purchased the property listed as her primary residence two months before closing on Loan 5128.  Docket No. 47 at 5, ¶ 17; Docket No. 48 at 18, ¶ 17.  Public records also indicate that the borrower and her husband owned a different property from June 16, 2003 through September 30, 2005.  Docket No. 48-4 at 57-61.  The borrower had taken out loans secured by two other properties within a year of obtaining Loan 5128.  Docket No. 47 at 5, ¶¶ 18-19; Docket

4

No. 48 at 19, ¶¶ 18-19.  These loans were not listed on the application for Loan 5128.

Docket No. 47 at 5, ¶ 20; Docket No. 48 at 19, ¶ 20.

Plaintiff maintains that the loan application did not contain a "12-month payment history for all mortgages appearing on the credit report and initial application"; defendant does not admit or deny this allegation.  Docket No. 47 at 11, 14-16; Docket No. 48 at 9 ("Plaintiff's brand new allegations in this motion of alleged 'undisclosed' debts and the supposed absence of a form documenting the borrower's 12-month mortgage payment history also strain credulity in multiple respects.") and 12 ("Plaintiff bemoans the supposed absence from the file of a '12-month mortgage payment history' for the borrower–but Plaintiff represented and warranted that everything that needed to be in the file was in the file when Plaintiff (or LBB) sold the loan to Freddie Mac.").

On February 27, 2006, LBB sold Loan 5128 to plaintiff and assigned plaintiff LBB's rights in the Agreement with respect to Loan 5128.[2]  Docket No. 53 at 1; Docket

---

[2]In response to plaintiff's motion for partial summary judgment, defendant disputes that LBB sold Loan 5128 to plaintiff or assigned plaintiff its rights in the loan pursuant to the Agreement.  Docket No. 48 at 18, ¶ 11.  (Defendant does not dispute this fact in its own motion for summary judgment.  Docket No. 53 at 3-4, ¶¶ 9, 11.)  In support of its contention, defendant cites the August 20, 2008 letter regarding alleged loan defects that it received from Aurora Loan Services.  Docket No. 47-5 at 29.  The letter references an Agreement between LBB and Freddie Mac.  *See id.* ("Pursuant to the Loan Purchase Agreement ("Agreement") between FHLMC and Lehman Brothers Bank, FSB ("Lehman") and the incorporated Seller's Guide, Lehman purchased the above-referenced mortgage loan (the "Loan") from FHLMC.").  Defendant also cites a print out from the Mortgage Electronic Registration System ("MERS") obtained by defendant's employee Becky Moore.  Docket No. 48-1 at 6, ¶ 14; Docket No. 48-2 at 22-23.  The printout indicates that Loan 5128 was transferred from Aurora Bank FSB to Freddie Mac on February 28, 2006.  *Id.* at 23.  To establish its rights in the Agreement, plaintiff cites (1) the promissory note for Loan 5128, endorsed from LBB to LBHI, Docket No. 47-2 at 113; (2) internal LBHI records indicating that the loan was transferred from LBB to LBHI on February 27, 2006, Docket No. 47-2 at 106; (3) Freddie Mac's March 31, 2008 demand letter, addressed to LBHI, Docket No. 47-5 at 1;

No. 1 at 5, ¶¶ 19-20; Docket No. 47-2 at 106.  The same day, plaintiff sold Loan 5128 to

the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Docket No. 53 at 1;

Docket No. 47 at 4, ¶ 11.  Plaintiff made the warranties and representations required by

Freddie Mac's Single-Family Seller/Servicer Guide.  Docket No. 53 at 4, ¶ 12; Docket

No. 60 at 2, ¶ 12; Docket No. 53-9.

Over two years later, on March 31, 2008, Freddie Mac sent a letter to plaintiff

stating:

> Freddie Mac has determined [that Loan 5128] is not of acceptable quality
> due to the violations of the Single-Family Seller/Servicer Guide sections
> and/or Master Agreement as noted below.
>
> **THIS LOAN WAS UNDERWRITTEN TO THE TERMS AND PROVISIONS
> OF THE SELLER'S MASTER COMMITMENT # . . . 1568 – NO
> DOCUMENTATION LOANS.**
>
> **CREDIT**
> The creditworthiness of the borrower was not documented in accordance
> with the requirements for a "No Documentation" loan.
>
> *The loan application indicated the borrower owned her primary residence
> for four years.
> *Public records confirmed the borrower had owned her primary home for two
> months.
> *A 12 month housing payment history was not provided.

Docket No. 47-5 at 3.  The letter demanded that plaintiff make Freddie Mac whole for

---

and (4) Freddie Mac records indicating the loan was transferred from LBHI on February
27, 2006.  Docket No. 55-2 at 14.  The Court agrees with plaintiff that the MERS print
out is inadmissible hearsay absent a declarant who can establish that it is a business
record or otherwise falls within an exception to the rule against hearsay.  *See* Fed. R.
Evid. 803(6).  In light of the documents from LBHI and Freddie Mac indicating that the
loan was transferred from LBB to LBHI and then to Freddie Mac, the August 20, 2008
letter is not sufficient to raise a genuine dispute of material fact as to LBHI's standing to
maintain this action.  *See Kannady v. City of Kiowa*, 590 F.3d 1161, 1173 n.9 (10th Cir.
2010) ("A mere scintilla of evidence supporting the nonmoving party's theory does not
create a genuine issue of material fact.") (citation omitted).

the alleged breach of the Single-Family Seller/Servicer Guide and the Master Commitment.  Docket No. 53 at 4, ¶ 13; Docket No. 60 at 2-3; Docket No. 47-5 at 1.

Freddie Mac's Repurchase Loss Statement indicates that a balance of $140,234.55 was due on Loan 5128 by August 11, 2008, with an additional $18.21 to accrue each day after that.  Docket No. 47-5 at 6.  On August 7, 2008, Aurora Loan Services, on behalf of LBHI, wired $1.5 million in make-whole funds to Freddie Mac, including $140,161.71 pertaining to Loan 5128.  Docket No. 47-5 at 18-21; Docket No. 48-4 at 8 (Deposition of LBHI's corporate representative, John Baker, at 63, ll.4-6); *see also* Docket No. 53 at 4, ¶ 15; Docket No. 60 at 3, ¶ 15.

On August 20, 2008, Aurora Loan Services sent a demand letter notifying defendant of alleged defects in Loan 5128 in violation of the warranties in the Seller's Guide.  Docket No. 53 at 4, ¶ 17; Docket No. 60 at 3.  On March 11, 2011, plaintiff filed a breach of contract action against defendant in the United States District Court for the Southern District of Florida.  Docket No. 53 at 4, ¶ 18; Docket No. 60 at 3; *see Lehman Brothers Holdings, Inc. v. Universal Am. Mortgage Co., LLC*, No. 11-cv-20859, Complaint [Docket No. 1] (S.D. Fla. Mar. 11, 2011).  On January 9, 2013, the Florida Court dismissed plaintiff's claim with respect to Loan 5128 without prejudice.  Docket No. 15-1.

On January 16, 2013, plaintiff refiled its claim in this Court.  Docket No. 1. Plaintiff alleges that defendant breached the Agreement by "breaching the representations, warranties, and/or covenants" set forth in the Agreement and by "refusing or otherwise failing to repurchase [Loan 5128] and/or failing to indemnify Lehman for its losses as to [Loan 5128]."  Docket No. 1 at 9, ¶¶ 39-44.  Plaintiff seeks

in excess of $140,000 in actual damages, plus prejudgment interests and costs.  *Id*. at

9-10.  On October 25, 2013, plaintiff moved for summary judgment.  Docket No. 47.  On

November 26, 2013, defendant moved for summary judgment.  Docket No. 53.  The

parties oppose one another's motions for summary judgment.  Docket Nos. 48 and 60.

## II.  STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248-50 (1986).  In pursuing summary judgment, the moving party generally bears

the initial burden of showing the absence of a genuine dispute concerning a material

fact in the case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, "[w]hen,

as in this case, the moving party does not bear the ultimate burden of persuasion at

trial, it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"Once the moving party meets this burden, the burden shifts to the nonmoving

party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of*

*Colorado, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing

*Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations

in the pleadings, but instead must designate "specific facts showing that there is a

genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid

summary judgment, the nonmovant must establish, at a minimum, an inference of the

presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. However, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

## III.  ANALYSIS

Defendant argues that Delaware's three-year statute of limitations bars plaintiff's claim that defendant breached the Agreement, which claim defendant contends accrued on December 30, 2005 when LBB purchased Loan 5128 from defendant. Docket No. 53 at 7-14. Plaintiff argues that either New York's or Colorado's six-year statute of limitations applies and that the limitations period did not start running until defendant refused to reimburse plaintiff for the payment to Freddie Mac. Docket No. 60 at 3-23. The Court will begin by addressing plaintiff's breach of contract claim to the

extent it alleges breach of the warranties in the Agreement and then by addressing

plaintiff's claim for indemnification.

### A.  Breach of Underlying Warranties and Failure to Repurchase

Defendant argues that plaintiff's contract claim is time barred under New York

law to the extent it is based on defendant's alleged breach of the underlying covenants

and failure to repurchase.  Docket No. 53.

New York's Civil Practice Law and Rules contain a "borrowing" statute, whereby

a claim that accrues outside of New York in favor of a party residing outside of New

York at the time the claim accrues is subject to the statute of limitations that would

apply in the state where the claim accrues, provided that period is shorter than the New

York limitations period.[3]  N.Y. C.P.L.R. § 202 (1962) ("CPLR 202").  The primary

purpose of the borrowing statute is to "prevent forum shopping by a nonresident

seeking to take advantage of a more favorable Statute of Limitations in New York."  *Ins.*

*Co. of North Am. v. ABB Power Generation, Inc.*, 91 N.Y.2d 180, 186 (N.Y. 1997).  It is

also "designed to add clarity to the law and to provide the certainty of uniform

application to litigants."  *Id*. at 187.

Applying the borrowing statute to parties that have "contracted to be venued" in

New York is not inconsistent with the law's purpose.  *Id*. at 188.  A forum-selection

---

[3]The borrowing statute states that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."  N.Y. C.P.L.R. 202.

clause does not "override" the borrowing statute.  *Global Fin. Corp. v. Triarc Corp.*, 93

N.Y.2d 525, 530 (N.Y. 1999); *see also Portfolio Recovery Assoc., LLC v. King*, 14

N.Y.3d 410, 415-16 (N.Y. 2010) (Delaware choice-of-law clause in parties' contract "did

not require the application of the Delaware three-year statute of limitations" because

"[c]hoice of law provisions typically apply to only substantive issues, and statutes of

limitations are considered 'procedural' because they are deemed 'as pertaining to the

remedy rather than the right.'") (citations omitted).

For the purpose of the borrowing statute, a claim "accrues" in the place where

and at the time when the "plaintiff first had the right to bring the cause of action."  *Global*

*Fin. Corp.*, 93 N.Y.2d at 528.   "When an alleged injury is purely economic, the place of

injury usually is where the plaintiff resides and sustains the economic impact of the

loss."  *Id*. at 529.

New York's statute of limitations for breach of contract claims is six years.  N.Y.

C.P.L.R. § 213(2).  Delaware's statute of limitations on contract claims is three years.

Del. Code. Ann. tit. 10, § 8106(a) (2008).

Defendant argues that LBB was a resident of Delaware at the time the claim

accrued, that the claim accrued in Delaware, and therefore that New York's borrowing

statute applies, cutting off plaintiff's claim in December 2008 according to Delaware's

three-year statute of limitations.  Docket No. 53 at 7-11.  On the other hand, plaintiff

argues that LBB was a New York resident "at the time the Loan was sold by [defendant]

to LBB" and thus that the "borrowing statute is inapplicable."  Docket No. 60 at 9.

Plaintiff further argues that the borrowing statute does not apply in this case because it

is a "principle[] of conflict of laws" excluded from the parties' agreement.  Docket No. 60

at 5-6; Docket No. 1-3 at 47, § 713.1.

### 1. When the Claim Accrued

Under New York law, a claim for breach of representations or warranties in a contract accrues at the time the misrepresentations are made, regardless of when the breach is discovered. *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (citing *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399 (1993)). A remedial provision, such as a cure or repurchase clause, does not extend the time in which a claim may accrue, nor does a party's request for repurchase give rise to a new claim. *Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, 2013 WL 2072817, at *8 (N.Y. Sup. Ct. May 10, 2013) ("The statute of limitations 'begins to run from the date of the first alleged breach,' not from the time plaintiff chooses to seek a remedy.") (citation omitted); *see also Hahn Automotive Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 771 (N.Y. 2012) ("the statute of limitations . . . was triggered when the party that was owed money had the right to demand payment, not when it actually made the demand"); *Ace Securities Corp. v. DB Structured Prods., Inc.*, 977 N.Y.S.2d 229, 231 (N.Y. App. Div. 2013) ("The motion court erred in finding that plaintiff's claims did not accrue until defendant either failed to timely cure or repurchase a defective mortgage loan. To the contrary, the claims accrued on the closing date of the [loan purchase agreement], . . . when any breach of the representations and warranties contained therein occurred.") (citations omitted).

Thus, plaintiff's claim for breach of the warranties in the Agreement and for failure to repurchase Loan 5128 or otherwise cure the alleged breach accrued on

December 30, 2005 when LBB purchased Loan 5128.  Docket No. 53 at 3, ¶ 9; Docket No. 60 at 2; *see Ace Securities Corp.*, 977 N.Y.S.2d at 231.

### *2.  Where the Claim Accrued*

Plaintiff contends that, at the time LBB purchased Loan 5128, its residence was in New York.  Docket No. 60 at 8-11.  Defendant contends that LBB's residence was in Delaware.  Docket No. 53 at 9-11.

Under New York law, a claim for purely economic injury accrues in the place where the injured plaintiff resides at the time of injury.  *Global Fin. Corp.*, 93 N.Y.2d at 529.  A corporation resides in New York if it is incorporated in New York or if its principal place of business is located there.  *In re Countrywide Fin. Corp. Mortgage-Backed Securities Litig.*, 834 F. Supp. 2d 949, 958 (C.D. Cal. 2012).  A federal savings bank, however, is not incorporated under the laws of any state, but rather is "wholly a creature of federal statutory law" insofar as it is created and governed by federal law.  *Lehman Brothers Holdings, Inc. v. Universal American Mortgage Company*, --- F. Supp. 2d ----, No. 13-cv-00091-REB-KMT, 2014 WL 292858, at *4 (D. Colo. Jan. 27, 2014); *see also* 12 U.S.C. § 1464(a)(2) (authorizing Comptroller of the Currency to issue charters for federal savings banks and promulgate regulations providing for their "organization, incorporation, examination, operation, and regulation"); *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 145 ("the [Federal Home Loan Bank] Board has promulgated regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave") (internal quotation marks and citation omitted).  The "principal office" of a federal savings bank is its home office,

12 C.F.R. § 561.39, from which it directs "[a]ll operations."  12 C.F.R. § 545.91(a).  A federal savings bank may only become a member of the Federal Home Loan Bank of the FHLB district in which the savings bank has its principal place of business.  12 C.F.R. § 1263.18.

Plaintiff cites *Countrywide Financial* in support of its contention that "the dispositive question is whether LBB had a significant connection to New York at the time the Loan was sold by [defendant] to LBB."  Docket No. 60 at 8-9.  Plaintiff does not, however, provide any support for the proposition that the residence of a federal savings bank is determined in the same manner as that of a private corporation.  On the contrary, federal law defines a federal savings bank's principal place of business as its home office.  *See* 12 C.F.R. § 545.91(a); *see also Lehman Brothers Holdings, Inc.*, 2014 WL 292858, at *5 ("the principal place of business of a federally chartered savings association is its home office").

In December 2005, LBB's home office was in Wilmington, Delaware.  Docket No. 53 at 2, ¶ 1; Docket No. 60 at 2, ¶ 1.  Moreover, LBB was a member of the FHLB district of Pittsburgh, which district includes Delaware, but not New York.  Docket No. 53 at 2-3, ¶ 2; Docket No. 60 at 2; *see also* http://www.fhlb-pgh.com/about-us/. Accordingly, the Court finds that plaintiff was a resident of Delaware in December 2005.

### 3.  Conflict of Laws

"Conflict of Laws is that part of the law of each state which determines what effect is given to the fact that the case may have a significant relationship to more than one state."  Restatement (Second) of Conflict of Laws § 2 (1971).  A court "will follow a

statutory directive of its own state on choice of law." *Id*. at § 6(1).  The Restatement of

Conflict of Laws sets forth seven "choice-of-law principles" to be considered when there

is no statutory directive, including the needs of the interstate system, the policies of the

forum state, and the protection of justified expectations.  *Id*. at § 6(2)(a)-(g); *see In re*

*Air Crash Near Clarence Center, New York, on February 12, 2009*, 798 F. Supp. 2d

481, 493 (W.D.N.Y. 2011) (applying principles listed in Restatement §§ 6(1)-(2) to

determine which state's law applied to punitive damages claim); *see also Global Fin.*

*Corp.*, 93 N.Y.2d at 528 ("there is a significant difference between a choice-of-law

question, which is a matter of common law, and [a] Statute of Limitations issue, which is

governed by particular terms of the CPLR").

   Defendant cites *Global Financial Corporation*, 93 N.Y.2d 525, and *Ledwith v.*

*Sears Roebuck & Co., Inc.*, 660 N.Y.S.2d 402 (N.Y. App. Div. 1997), for the proposition

that CPLR 202 is not a conflict-of-laws principle excluded by the parties' contract.

Docket No. 53 at 8-9.  Plaintiff argues that *Global Financial Corporation* is inapposite

because it concerns a choice-of-law question as opposed to a conflict-of-laws principle.

Docket No. 60 at 6.  Plaintiff, however, does not identify a meaningful difference

between these terms.  *See id*.  Although "choice of law" may refer to the parties' choice

of law as provided for in a contract, it also refers to the principles courts apply in

resolving a conflict of laws; accordingly, Black's Law Dictionary defines "choice of law"

as "the question of which jurisdiction's law should apply in a given case."  Black's Law

Dictionary 1900 (9th ed. 2009); *compare id*., choice-of-law clause ("A contractual

provision by which the parties designate the jurisdiction whose law will govern any

disputes that may arise between the parties."). "Conflict of laws" is defined as the "body of jurisprudence that undertakes to . . . decide what law is to govern" when a "transaction or occurrence central to the case has a connection to two or more jurisdictions" and is synonymous with "the principles of choice of law." *Id*., conflict of laws. The Court finds there is no difference between these terms as used in *Global Financial Corporation*.

Second, plaintiff argues that *Global Financial Corporation* does not apply because that case held only that choice-of-laws principles should not guide the interpretation of the term "accrue" in applying CPLR 202, an issue that plaintiff contends is not before the Court. Docket No. 60 at 4-6.

In *Global Financial Corporation*, the court had to determine where a breach of contract claim accrued given that the claim was brought by a company incorporated in Delaware with its principal place of business in Pennsylvania to redress the alleged breach of a contract that was negotiated, executed, and substantially performed in New York. 93 N.Y.2d at 528. The plaintiff argued that the court should apply "substantive choice-of-law" principles, such as the "grouping of contacts" approach, to find that the claim accrued in New York, thereby barring application of CPLR 202. *Id*.

The court rejected this argument, drawing a distinction between substantive choice-of-laws principles grounded in common law and the principles of statutory construction relevant to interpreting CPLR 202. *Id*. Instead of applying a modern choice-of-laws analysis, the court looked to how the New York Legislature would have understood the term "accrue" when it enacted CPLR 202 in 1962. *Id*. at 529. The court

16

concluded that a purely economic injury accrues, within the meaning of CPLR 202, in the plaintiff's state of residence at the time of the injury. *Id*. at 529-30.

As discussed above, plaintiff resided outside of New York at the time the contract was allegedly breached. Thus, plaintiff's claim, which is purely economic, accrued outside of New York. *See Global Fin. Corp.*, 93 N.Y.2d at 529-30. Plaintiff argues that, despite these facts, CPLR 202 does not apply because it is a conflict-of-laws principle, excluded by the contract. Docket No. 60 at 4-7. *Global Financial Corporation* held that CPLR 202 controls even when common law conflict-of-laws principles would require a different outcome. 93 N.Y.2d at 528. The holding that choice-of-laws principles are not relevant to interpreting CPLR 202 supports the conclusion that CPLR 202 is not itself a choice-of-laws principle. *See id.*

Plaintiff also seeks to distinguish *Ledwith*, 660 N.Y.S.2d 402, on the grounds that the case is relevant only to the determination of residency under CPLR 202. Docket No. 60 at 6-7. The Court disagrees. *Ledwith* held that, in applying CPLR 202, the court should borrow not only Oregon's statute of limitations, but also its statute of repose because CPLR 202 is "not confined to the statute of limitations but embraces all the laws that serve to limit the time within which an action may be brought." 660 N.Y.S.2d at 406. The court stated that "modern choice-of-law decisions are simply inapplicable to the question of statutory construction presented by CPLR 202" and explained that, if the rules were otherwise, courts could choose to apply New York's statute of limitations where favorable, instead of applying the law "as written, without recourse to a conflict of law analysis." *Id*. (internal citations omitted). *Ledwith* confirms the conclusion that

17

CPLR 202 falls outside of, and is incompatible with, New York's conflict-of-laws principles. It is not a factor to be weighed in determining which body of law most appropriately governs a case, but a black-letter rule that courts apply strictly, "as written." *See id*.

Plaintiff cites *IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A.*, 20 N.Y.3d 310 (N.Y. 2012), for the proposition that a "choice-of-law provision incorporating New York law impliedly excludes New York's conflict-of-law rules." Docket No. 60 at 5. *IRB-Brasil*, however, addressed the application of New York's "common-law conflict-of-laws principles," not its statutory law. 20 N.Y.3d at 315-16 ("the parties' decision to apply New York law to their contract results in the application of New York substantive law, not New York's conflicts principles"). CPLR 202 is not a common law conflict-of-laws principle, but rather part of the "well-developed system of commercial jurisprudence" for which the parties bargained. *See id*. at 314 (citation omitted). The court's concerns in *IRB-Brasil*–avoiding a "complicated conflict-of-laws analysis" and "eliminating uncertainty regarding the governing law," *see id*. at 316–are served by applying New York statutory law as written, instead of developing a new set of rules to determine when parties can contract out of particular statutory provisions. This approach is in line with CPLR 202's purpose of "add[ing] clarity to the law and . . . providing] the certainty of uniform application to litigants." *ABB Power Generation*, 91 N.Y.2d at 187.

Plaintiff argues that CPLR 202 is inapplicable because the parties contracted for the application of New York's remedial law, including its six-year statute of limitations. Docket No. 60 at 7-8 (citing Docket No. 1-3 at 47, § 713.1) ("the obligations, rights and

remedies of the parties hereunder shall be determined in accordance with" New York substantive law)).  However, CPLR 202 is part of New York's remedial law, not external to it.  *See Portfolio Recovery Assoc.*, 14 N.Y.3d at 416.  Thus, in *Portfolio Recovery Associates*, the court found that the parties' contractual choice of Delaware law did not include Delaware's statute of limitations because a limitations period pertains to "the remedy rather than the right" and instead applied New York law–including CPLR 202–to determine the statute of limitations.  *Id*.  *Portfolio Recovery* shows that CPLR 202 is part of the remedial law for which the parties bargained in this case.  *See id*.

Finally, plaintiff's reliance on *In re Agent Orange Product Liability Litigation*, 597 F. Supp. 740 (E.D.N.Y. 1984), is misplaced.  *In re Agent Orange* describes CPLR 202 as a "special conflict of laws provision."  *Id*. at 810.  However, this description was not the subject of analysis and is not sufficient to undermine the conclusion reached above.  *See Lehman Brothers Holdings, Inc.*, 2014 WL 292858, at *3 n.8 (describing the characterization as dicta).

In addition, *In re Agent Orange* held that, "[w]here CPLR 202 causes another state's statute [of limitations] to be borrowed, that state's statute and the interpretations given its tolling and other provisions will be applied as a total package."  597 F. Supp. at 801.  Plaintiff argues that "the interpretations given [a state's] tolling and other provisions" includes a state's choice-of-law principles.  There is no support for this argument.

Courts applying CPLR 202 do not look to the choice-of-law provisions in the state from which they borrow the statute of limitations.  *See In re Gaston & Snow*, 243

F.3d 599, 608 (2d Cir. 2001) ("In certain cases, CPLR 202 may mandate the application of the statute of limitations of a jurisdiction whose contacts with the action are not the most significant."); *Baena v. Woori Bank*, 2006 WL 2935752, at *7 (S.D.N.Y. Oct. 11, 2006) ("New York has rejected incorporation of a foreign jurisdiction's choice of law analysis under CPLR § 202.").  For this reason, the application of CPLR 202 does not implicate *renvoi*–the "problem arising when one state's rule on conflict of laws refers a case to the law of another state, and that second state's conflict-of-law rule refers the case either back to the law of the first state or to a third state."  Black's Law Dictionary (9th ed. 2009), renvoi; *see also Ledwith*, 660 N.Y.S.2d at 406 ("courts have refused to apply renvoi . . . to circumvent CPLR 202").

In sum, the Court finds that plaintiff's claim for breach of the Agreement's warranties and for failure to cure is barred by Delaware's three-year statute of limitations.

## B.  Indemnification

Plaintiff alleges that defendant breached the Agreement by failing to indemnify plaintiff for the losses sustained in reimbursing Freddie Mac for Loan 5128.  Docket No. 7 at 9, ¶ 45.  Defendant responds that (1) the alleged warranty breaches did not cause plaintiff's losses and (2) plaintiff fails to satisfy the requirements for an indemnification claim.  Docket No. 48.

The Aurora Loan Services Seller's Guide contains the following indemnification clause:

> In addition to any repurchase and cure obligations of Seller, and any and all other remedies available to Purchaser under this Seller's Guide and the Loan

Purchase Agreement, Seller shall indemnify Purchaser and Purchaser's designee . . . from and hold them harmless against all claims, losses, damages, penalties, fines, claims [sic], forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent.

Docket No. 7-3 at 46, § 711.

A breach of contract claim has four elements: the existence of a valid contract, plaintiff's performance, defendant's failure to perform, and damages. *Kausal v. Educational Prods. Info. Exchange Institute*, 964 N.Y.S.2d 550, 551 (N.Y. App. Div. 2013). Under New York law, contract interpretation is initially a matter for the Court; however, ambiguous language–i.e., language susceptible to more than one interpretation–should be submitted to the trier of fact. *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, 874 F. Supp. 2d 328, 333 (S.D.N.Y. 2012) (citations omitted). In interpreting a contract, a court should give words their plain meaning and seek to "give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Id*. (citations omitted).

"When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper Assoc. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (N.Y. 1989). An indemnification claim "is independent of the underlying wrong and for the purpose of the Statute of Limitations accrues when the loss is suffered by the party seeking indemnity" through payment to a third party. *McDermott v. City of New*

21

*York*, 50 N.Y.2d 211, 215 (N.Y. 1980).

"[W]hen an indemnitor had notice of the claim against it and an opportunity to take over the defense, the indemnitee need only show potential liability, *i.e.*, that indemnitee could have been found liable at the trial of the underlying action." *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 222-23 (S.D.N.Y. 2010). However, when the "indemnitor had no notice or opportunity to defend, the indemnitee must demonstrate 'actual liability' on the underlying claim." *Id.* (citation omitted); *see also Feuer v. Menkes Feuer, Inc.*, 187 N.Y.S.2d 116, 122 (N.Y.A.D. 1959) ("in order to recover reimbursement," an indemnitee who does notify the indemnitor of the claim "must establish that he would have been liable[,] that there was not [sic] good defense to the liability," and that "the amount paid [] was a reasonable amount").

There is no material dispute that the Aurora Loan Services Seller's Guide constituted a valid contract between the parties, that plaintiff performed on that contract, and that plaintiff suffered damages in making Freddie Mac whole for losses on Loan 5128. As a threshold matter, the Court finds that plaintiff's indemnification claim is not time-barred because it did not accrue until August 7, 2008 when plaintiff made Freddie Mac whole for Loan 5128. Docket No. 47-5 at 18, 21; *see McDermott*, 50 N.Y.2d at 214. The claim accrued less than three years before plaintiff filed suit in the Southern District of Florida in March, 2011; thus, the claim is timely regardless of whether the New York or Delaware statute of limitations applies.

Defendant argues that its denial of plaintiff's indemnification request did not breach the contract because plaintiff's damages were caused by plaintiff's independent

22

breach of its contract with Freddie Mac and not by any of defendant's actions.  Docket

No. 48 at 9-16.  In other words, defendant argues that the indemnification clause does

not cover losses caused by plaintiff's breach of a separate contract.  *Id.*

The decision in *Assured Guaranty Mun. Corp. v. DB Structured Prods., Inc.*, 927

N.Y.S.2d 880 (N.Y. Sup. Ct. 2011), undermines defendant's argument.  In that case,

the court considered a loan purchaser's claim for indemnification pursuant to a clause

that obligated the loan originator to:

> indemnify the Purchaser and hold it harmless against ***any*** losses, damages,
> penalties, fines, forfeitures, reasonable and necessary legal fees and related
> costs, judgments, and other costs and expenses resulting from any claim,
> demand, defense or assertion based on or grounded upon, or ***resulting***
> ***from, a breach of [the originator's] representations and warranties***.

*Id.* at 887 (emphasis in original).  The purchaser alleged that the originator had

breached representations and warranties in the parties' purchase agreement, in turn

causing the purchaser to breach warranties and representations in a subsequent

contract with a downstream purchaser.  *Id.*  The loan originator argued that the

indemnification clause did not cover claims against the purchaser for its own contractual

breach in a different contract.  *Id.* at 889.

The court explained that the "law is clear" that, if a plaintiff "sues on a warranty

and if the defendant has a warranty from the third-party co-extensive with the warranty

given to the plaintiff by the defendant then a third-party complaint will stand against a

third-party defendant."  *Id.* at 890-91 (quoting *Humble Oil & Refining Co. v. M.W.*

*Kellogg Co.*, 215 N.Y.S.2d 416, 418 (N.Y. App. Div. 1961)).  The court held that the fact

that the warranties were "contained in separate contracts between separate parties"

was "not sufficient to show that the two sets of representations and warranties are not co-extensive." *Id*. at 891.  The court found that the purchaser's liability on its subsequent contract could constitute a loss or expense "resulting from[] a breach of [the originator's] representations and warranties."  *Id*. at 892; *see also id*. at 894 ("The fact that the same loss can also be causally and/or counterfactually traced to a breach of representations and warranties by [the purchaser], does not sever the causal/counterfactual link to a breach of representations and warranties of [the originator] because, as discussed, the two purported breaches involve the same circumstances and events.").  The court noted that the rule of construction limiting indemnity agreements such that they cover the indemnitee's wrongdoing only where clearly stated has been applied exclusively in the context of tort claims.  *Id*. at 894 n.13 ("Unlike negligence, breach of contract is not necessarily a 'wrongdoing' to which the policy behind the rule applies.").

The reasoning of *Assured Guaranty* is persuasive.  The indemnification clause at issue in this case is broad, extending to "all claims, losses, [or] damages . . . that the Purchaser may sustain in any way related to or resulting from. . . any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement."  Docket No. 7-3 at 46, § 711.  The Court finds that the indemnification provision unambiguously renders defendant liable for breaching warranties in the Agreement that are co-extensive with the warranties plaintiff breached in its contract with Freddie Mac.  *See Assured Guaranty*, 927 N.Y.S.2d at 895.

This conclusion is buttressed by the fact that the Agreement did not require

24

plaintiff to verify the truth of defendant's representations in order to seek indemnification.  *See* Docket No. 7-3 at 27, § 701 ("Purchaser's rights in connection with Seller's representations, warranties and covenants . . . are not affected by any investigation or review made by, or on behalf of, Purchaser[.]"); *id*. at 47, § 712 ("Purchaser's remedies for breach of the representations, warranties or covenants set forth herein . . . will continue in full force and effect, notwithstanding . . . failure to examine any related Mortgage Loan File by Purchaser."); *id*. at 51, § 717 ("Seller acknowledges that failure of Purchaser to review or discover any deficiency or error in the Mortgage Loan at time of Purchase by Purchaser will neither release Seller from its obligations to provide any required documentation or correct any errors, nor will it prevent or inhibit Purchaser's exercise of any of its remedies.").  To the extent defendant relies on extrinsic evidence to show that, under the Agreement, plaintiff assumed the risk of purchasing non-conforming loans, *see* Docket No. 48 at 7, this argument is unavailing: "[e]xtrinsic evidence of the parties' intent may not be admitted to create ambiguity in a contract that is unambiguous on its face."  *County of Suffolk v. Long Island Power Authority*, 954 N.Y.S.2d 619, 623 (N.Y. App. Div. 2012).

Plaintiff alleges that defendant breached the contract by representing that the borrower had owned her primary residence for four years, when in fact she had owned it for two months.  Docket No. 47 at 14-16.  Defendant argues that this misrepresentation did not cause plaintiff's damages because the borrower had owned a different property for over two years and thus was not a First Time homebuyer within the meaning of LBB's guidelines.  Docket No. 48 at 10.  However, even if defendant did

25

not breach the Agreement by extending a No Doc loan to the borrower, it did breach its

representation that no "document, report or material furnished to Purchaser in any

Mortgage Loan File or related to any Mortgage Loan . . . was falsified or contains any

untrue statement of fact or omits to state a fact necessary to make the statements

contained therein not misleading."  Docket No. 7-3 at 31, § 703(1).  Since Freddie Mac

cited this inaccuracy as a basis for requiring plaintiff to repurchase the loan, there can

be no genuine dispute that defendant's breach caused plaintiff's losses.

In other words, plaintiff has demonstrated that the inaccuracy identified by

Freddie Mac was indeed present and thus that plaintiff was liable to Freddie Mac for

Freddie Mac's losses on the loan, regardless of whether plaintiff was under a court

order to make the payment. *See Feuer*, 187 N.Y.S.2d at 122.  Defendant argues that

its misrepresentation was "immaterial to this type of loan product," Docket No. 53 at 17,

but there is no evidence that plaintiff was liable to Freddie Mac on only material

misrepresentations.  In light of the undisputed evidence, defendant's argument that

plaintiff was not legally required to make Freddie Mac whole fails.[4]

---

[4]Defendant argues that "Plaintiff has conceded[ that] the payment may simply have been 'political' in nature (designed to keep LBHI in the good graces of Freddie Mac, an important business partner)."  Docket No. 53 at 17.  The deposition testimony cited in support of this assertion does not support it: "Q.  Fair enough.  But–and–and even more in fairness I hope, I mean, I guess it's clear that there could be any number of reasons that LBHI might agree to either repurchase or make a make-whole payment on a loan.  It could–certainly it could be, you know, just kind of for political reasons in order to maintain a relationship with Fannie or Freddie, we're going to throw them a bone on–on this loan or these couple loans, it's kind of the cost of doing business?  A. I don't know.  Q.  Okay.  And don't you acknowledge that's certainly something that could go into LBHI's thinking in determining how hard to fight something with Fannie or Freddie?  A.  I don't know what LBHI was thinking at that time, but I understand that a pretty common consideration in business generally."  Docket No. 53-2 at 13-14 (Baker dep., at 91, l.18 to 92, l.9).

Defendant further argues that "the borrower's error did not go uncorrected" because, "[b]efore selling this loan, Universal delivered to its contractual counter-party, Lehman Brothers Bank . . . a timely and valid credit report that highlighted the borrower's error.  LBB knew exactly what Universal knew."  Docket No. 48 at 10 n.4.  However, as explained above, plaintiff was not obligated to review the loan documents and discover this error in order to seek its remedies under the Agreement.  *See* Docket No. 7-3 at 51, § 717.  Regardless of whether defendant supplied plaintiff with additional documentation revealing this inaccuracy, there is no dispute that the loan documents were inaccurate, in breach of the Agreement.  Plaintiff did not waive this inaccuracy, *see* Docket No. 7-3 at 44, § 707, and there is no genuine dispute of fact that this inaccuracy rendered plaintiff liable to Freddie Mac.

Accordingly, plaintiff is entitled to summary judgment on its indemnification claim.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Universal's Motion for Summary Judgment [Docket No. 53] filed by defendant Universal American Mortgage Company, LLC is GRANTED in part.  Plaintiff's claim for breach of contract is dismissed to the extent it is based on defendant's breach of the warranties and representations in the Loan Purchase Agreement or the Aurora Loan Services, LLC Seller's Guide and on defendant's failure to repurchase Loan 5128.  It is denied with respect to plaintiff's claim for indemnification.  It is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Docket No. 47]

filed by plaintiff Lehman Brothers Holdings, Inc. is GRANTED in part.  Defendant is liable on plaintiff's claim for indemnification regarding the make-whole payment to the Federal Home Loan Mortgage Corporation on Loan 5128.  It is denied in all other respects.  It is further

ORDERED that Plaintiff's Motion for Leave to File its Motion to Exclude Defendant's Expert Out of Time [Docket No. 59], Plaintiff's Motion for Leave to File Surreply to Defendant's Reply in Support of Defendant's Motion for Summary Judgment [Docket No. 66], Plaintiff's Unopposed Motion for Oral Argument [Docket No. 69], Universal's Motion for Leave to File Supplemental Authorities [Docket No. 87], Universal's Motion for Leave to File Notice of Ruling in Related Cases and Other Supplemental Authority in Further Support of its Motion for Summary Judgment [D.E. 53] [Docket No. 90], Plaintiff's Amended Motion for Oral Argument [Docket No. 91], Plaintiff's Motion in Limine to Exclude Inadmissible Evidence and Evidence Not Disclosed as Required by Fed. R. Civ. P. 26 [Docket No. 99], and Universal's Motion *In Limine* to Preclude Any Reference to Newly-Raised Allegations by LBHI [Docket No. 100] are DENIED as MOOT.  It is further

ORDERED that the four-day jury trial set for July 21, 2014 [Docket No. 83] shall proceed on the issue of damages.

DATED July 8, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

28