UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

CASE NO. 1:13-CV-00090-PAB-MJW

LEHMAN BROTHERS HOLDINGS, INC.,

       Plaintiff,

v.

UNIVERSAL AMERICAN MORTGAGE
COMPANY, LLC,

       Defendant.

---

**UNIVERSAL AMERICAN MORTGAGE COMPANY, LLC'S MOTION TO AMEND JUDGMENT PURSUANT TO F.R.C.P. 59**

---

Rule 59(e) of the Federal Rules of Civil Procedure specifically authorizes a party to seek alteration or amendment of a judgment entered against it, thereby asking the Court to reconsider the findings and conclusions that led to that judgment. It is nevertheless with trepidation and humility that Universal American Mortgage Company, LLC ("UAMC") seeks to demonstrate that the Court's 28-page Order (Doc. No. 115) awarding partial summary judgment (as to liability) to Plaintiff was marred by at least four case-altering errors. UAMC asks for alteration or amendment of the Order on the basis of those errors.

The first of the grounds for this motion is the Order's failure to recognize that indemnification is, in this instance, merely a contractual remedy, not a common-law claim with its own distinct "trigger" for statute of limitations purposes. The Court applied a contract governed by New York law by, in essence, recognizing a purported claim (for failure to provide requested contractual indemnification) that has been expressly and repeatedly prohibited as a stand-alone cause of action under New York law, and that was not pled by Plaintiff in any event.

It then conferred upon Plaintiff's request for the contractual remedy of indemnification a power also specifically prohibited under governing law: the power to extend the limitations period (or trigger a new limitations period) for the party seeking that contractual remedy.

Second, the Order correctly states the legal standard applicable to a request for indemnification by a party that never provided timely notice of the underlying claim for which it now seeks indemnification -- but the Order then fails to apply that standard. Application of that standard would, at an absolute minimum, bar an award of partial summary judgment to Plaintiff, which has never even attempted to develop or demonstrate proof of any of the facts required to be established under the standard cited by the Court.

The final two errors are separate instances in which the Court either overlooks irrefutably material conflicting evidence as to subjects that it treats as "undisputed," or (if the conflicting evidence was not actually overlooked) has "weighed" and resolved the conflicting evidence, which is not to be done by a court in resolving motions for summary judgment.

Each of the four critical errors is detailed below. UAMC respectfully submits that it believes all of these errors are manifestly present in, and plainly material to, the Order, but notes that any one of them acknowledged by the Court would warrant the alteration and reversal of the Order.

**Conferral Pursuant to D.C. COLO. LCivR 7.1**: The parties have conferred regarding this motion and Plaintiff opposes the requested relief.

### 1. Indemnification is a Contractual Remedy, Not a Stand-Alone Cause of Action, and Does Not Extend the Statute of Limitations

In each of at least eight cases decided this year (six by this Court -- four of which involve these same parties -- and two by the District Court of Douglas County),[1] Plaintiff or its affiliate Aurora Commercial Corp. ("Aurora") (f/k/a Lehman Brothers Bank) has sought to enforce this same form agreement, but had its claims under that agreement deemed time-barred. In each of those suits, Plaintiff (or Aurora) asserted the same claim that it makes in this case: that a defendant breached the parties' contract and owes the plaintiff relief in the form of indemnification.

> At page 12 of its Order, the Court correctly noted that:
>
> A remedial provision, such as a cure or repurchase clause, does not extend the time in which a claim may accrue, nor does a party's request for repurchase give rise to a new claim. *Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.*, 2013 WL 2072817, at *8 (N.Y. Sup. Ct. May 10, 2013) ("The statute of limitations 'begins to run from the date of the first alleged breach,' not from the time plaintiff chooses to seek **a remedy**.") (Emphasis added).

But the Court did not take into account that the right to demand contractual indemnification, like the right to demand cure or repurchase, is itself nothing more than a remedial provision, which does not by any means extend the time in which a claim may accrue -- and, likewise, a party's request for indemnification certainly does not give rise to a new or distinct claim under New York law.

---

[1] Those decisions came in the cases of *Lehman Brothers Holdings, Inc. ("LBHI") v. UAMC*, 2014 WL 292858 (D. Colo. Jan. 27, 2014) (Blackburn, J.); *Aurora v. Standard Pacific Mortgage*, 2014 WL 1056383 (D. Colo. March 19, 2014) (Martinez, J.); *LBHI v. UAMC*, 2014 WL 1715365 (D. Colo. Apr. 30, 2014) (NO. 13-CV-00087-CMA-MJW); *LBHI v. UAMC*, 2014 WL 1715225 (D. Colo. Apr. 30, 2014) (NO. 13-CV-00088-CMA-MEH); *LBHI v. UAMC*, 2014 WL 1715204 (D. Colo. Apr. 30, 2014) (NO. 13-CV-00093-CMA-MJW); *LBHI v. First California Mortgage Corporation,* 2014 WL 1715120 (D. Colo. Apr. 30, 2014) (Arguello, J.). Additionally, similar orders were issued by the District Court of Douglas County, Colorado in *LBHI v. TBI Mortgage Company f/k/a Westminster Mortgage*, Case No. 2012CV2437 and *LBHI v. Guaranteed Rate, Inc.*, Case No. 2012CV1340.

As an initial matter, it can hardly be disputed that indemnification, when provided for in a commercial contract, is a remedial device. No shortage of legal primers and practice guides make this point. *See*, *e.g.*, http://us.practicallaw.com/7-520-6530?source=relatedcontent ("This Checklist presents issues to consider when drafting and negotiating remedial provisions in a commercial contract to ensure that indemnification and other contractual remedies and remedy-related provisions interact in a consistent and compatible manner. It also includes issues to consider if the parties designate indemnification as the exclusive (or sole) remedy for contractual breaches and non-compliance."). And contractual "indemnification" is, of course, nothing more than reimbursement -- "compensatory damages" -- for alleged losses. Governing New York law makes clear that "there is no practical difference between [a] 'repurchase' remedy and compensatory damages." *Deutsche Alt-A Securities Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*, 958 F.Supp.2d 488, 501-502, 2013 WL 3863861, *11 (S.D.N.Y.,2013), quoting *Orix Real Estate v. Superior Bank, FSB*, 127 F.Supp.2d 981, 983 (N.D.Ill.2000) (applying New York law). The notion, therefore, that Plaintiff's demand for a "cure," or for "repurchase," admittedly would not extend the statute of limitations for Plaintiff's claim (or trigger the running of a new limitations period), but that a request for "indemnification" somehow does, is directly contrary to well-settled New York law. It is a classic distinction without a difference.[2]

---

[2] Plaintiff's business model was to re-sell loans that it acquired from loan originators, such as UAMC. It did not hold such loans in its own portfolio. It would thus make a repurchase demand, in the vast majority of instances, only after allegedly having repurchased a loan from a third party, such as Fannie Mae or Freddie Mac. Again, therefore, the idea that New York law prohibits (as it surely does) an extension of the statute of limitations as a result of a "post-repurchase" demand for repurchase by Plaintiff, but supposedly permits it for a "post-indemnification" demand for indemnification, would make no sense, and is simply incorrect.

Moreover, under both New York and Delaware law (Delaware being the state whose statute of limitations rules are ultimately implicated by application of New York's borrowing statute in this instance), seeking indemnification as a contractual remedy for an alleged breach of contract does nothing whatsoever to alter the limitations period. "[U]nder New York law, claims which are subject to pre-suit cure or demand requirements accrue when the underlying breach occurs, not when the demand is subsequently made or refused." *Lehman XS Trust, Series 2006-4N v. Greenpoint Mortgage Funding, Inc.*, 2014 WL 108523, at *3 (S.D.N.Y. January 10, 2014). The right to indemnification is, of course, subject to cure or demand requirements that were established pre-suit. And "New York law . . . **does not recognize pre-suit remedial provisions as constituting separate promises which can serve as the basis for independent causes of action**." *Id.* at *4) (citations and internal quotation omitted) (emphasis added). *See also*, *e.g.*, *Structured Mortg Trust 1997-2 v. Daiwa Fin. Corp.*, No. 02 42 Civ. 3232, 2003 WL 548868, at *2-3 (S.D.N.Y. 2003) ("Daiwa's false warranties and representations breached the contract at its inception in March 1994 . . . [S]ince the facts warranted in the March 1994 Pooling Agreement were not true when made, the statute of limitations began to run at that time, and expired six years later. . . . [P]laintiffs are asking this Court to [impose] in contract cases where there is a demand requirement . . . the otherwise rejected accrual-at-injury rule. Plaintiffs' argument must be rejected."); *Nomura Asset Acceptance Corp. Alternative Loan Trust, Series 2005-S4 v. Nomura Credit & Capital, Inc.,* 39 Misc. 3d 1226(A), at *9-10 (Sup. Ct. N.Y. Co. 2013) ("If the Mortgage Representations were false when made, they are still false today. . . . The Statute of Limitations runs from the time of breach of the Mortgage Representations, not from the time plaintiff elected to make demands for repurchase.").

The Court's Order in this case treats a demand for one contractual remedy, "indemnification," as if it is so different from a demand for another remedy available under the same contract, "repurchase," as to have its own accrual period. There is no support whatsoever for that approach under New York law pertaining to contractual remedies and demands for those remedies. To the contrary, *all* contractual remedies are dealt with in accordance with the principles articulated in the cases cited in the previous paragraph.

There is no dispute here that indemnification was established pre-lawsuit in the parties' contract as a remedy potentially available to Plaintiff (and, incidentally, potentially available to Plaintiff long before it allegedly made a payment to a government agency, since Plaintiff was entitled to seek possible indemnification for *any* loss -- such as failure to get the benefit of its contractual bargain, or any loss of fees as a consequence of a non-payment by the borrower, or foreclosure-related costs, or attorneys' fees, for example). Therefore, Plaintiff's alleged payment to a third party does not serve as a basis for determining when its cause of action accrued. Delaware's case law likewise makes clear that breach of contract claims arising from the sale of a supposedly defective residential mortgage loan accrue on the date when the loan is sold by the defendant and not on the later date when a compensatory payment (or an outright repurchase of the loan) is allegedly made by the plaintiff to a third party. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings, LLC*, 2012 WL 3201139 (Del.Ch. 2012) (breach of contract case in which the plaintiff sought payment from the defendant under a contract after repurchasing loans from government-sponsored entities Fannie Mae and Freddie Mac). In pertinent part, the *Central Mortgage* court held as follows:

> Delaware's statute of limitations for contract claims begins to run on the date of the breach, regardless of whether the plaintiff is ignorant of the cause of action [footnote omitted]. That is established law and not subject to debate. 'Because representations and warranties about facts pre-existing, or contemporaneous with,

6

a contract's closing are to be true and accurate when made,' a breach of such representations and warranties 'occurs on the date of the contract's closing and hence the cause of action accrues on that date.'

Rejecting the notion that the date of a subsequent alleged payment by a plaintiff to a third party is the accrual date in a case such as this one, the *Central Mortgage* court held that:

> The act of the Agency [*e.g.*, Freddie Mac or Fannie Mae] putting back the loan [to Central Mortgage] does not give rise to a claim for breach of contract against [the defendant,] Morgan Stanley. Central Mortgage's breach of contract claims under the Master Agreement and transaction-specific documents are for breaches of the representations and warranties with respect to the information about particular loans. Those claims accrued under Delaware law when Central Mortgage bought the servicing rights. The accuracy of the underlying loan information data is independent of whether the Agencies put back the loans, because if that information was not accurate, it was not accurate from the time the contract was entered, regardless of whether the Agency discovered it or not. Rather, the Agencies' decision to put back the loans simply gave Central Mortgage a [new] reason to dig into the files of the specific loans to determine whether a breach by Morgan Stanley in fact occurred.

*Id.* at *20.

The Order granted partial summary judgment to Plaintiff after concluding "[P]laintiff's claim for breach of the Agreement's warranties and for failure to cure" was time-barred (doc. no. 115 at 20), but that its claim relating to "indemnification" was not (*id.* at 27). Beyond the fact that this is contrary to the cases cited above and the *Nomura* precedent cited by the Court, there are two additional substantial problems with the analysis that led to that result. First, Plaintiff's claim, as pled in its pleading of record, is simply for breach of contract; this is not an "indemnification" cause of action, nor could it be under governing New York law, as demonstrated above.

Second, the only case cited by the Court for the proposition that "indemnification" claims accrue when the purported damage is sustained is a case from more than three decades ago, one that is a common-law (tort) indemnification case that has nothing to do with contractual

7

indemnification relief. Nor does it in any way trump, or even relate to, the body of law that has developed in New York and Delaware pertaining to how the statute of limitations applies to demands for contractual remedies, such as indemnification. There is no dispute that a common-law indemnity claim (such as a claim for reimbursement for medical expenses after an accident) accrues when the costs are incurred. But this is not a common-law indemnity claim, it is a contractual claim, and in this instance Plaintiff would have incurred a loss, in any event, the moment that it received a loan that purportedly was not that for which it bargained.

This District Court has repeatedly resolved cases involving this very same form contract by applying the New York borrowing statute and recognizing that it barred Plaintiff's claims. It did so over Plaintiff's repeated and inaccurate protests in its briefing that its request for indemnification bestowed upon it a later accrual date for limitations purposes. When this Court, and the District Court of Douglas County, granted summary judgment to UAMC and other defendants, they acted entirely in accordance with governing law.

**2. Evidence of a Payment on Behalf of LBHI to Freddie Mac Is Lacking and Is Very Much in Dispute**

At page 7 of its Order, the Court states that the following fact is undisputed:

On August 7, 2008, Aurora Loan Services, on behalf of LBHI, wired $1.5 million in make-whole funds to Freddie Mac, including $140,161.71 pertaining to Loan 5128. Docket No. 47-5 at 18-21; Docket No. 48-4 at 8 (Deposition of LBHI's corporate representative, John Baker, at 63, ll.4-6); see also Docket No. 53 at 4, ¶ 15; Docket No. 60 at 3, ¶ 15.

In support of its finding, the Court cites to an *internal* wire *authorization,* deposition testimony of Mr. Baker stating that "Aurora [Loan Services] would have made the payment on behalf of LBHI," and UAMC's statement in its Motion for Summary Judgment that "*Plaintiff asserts* that, on August 7, 2008, it made Freddie Mac whole via a wire transfer that included payments for several loans, including the Loan at issue in this case." (Emphasis added). As an

initial matter, UAMC clearly did not concede in the above quoted statement that Plaintiff made a payment to Freddie Mac, only that this was the allegation made by Plaintiff.

The only documentary evidence submitted by LBHI in support of its claim that Aurora Loan Services indemnified Freddie Mac on its behalf is the wire authorization noted by the Court and a "Summary/Long Description Report," a report that appears to have been generated by Aurora Loan Services. (Doc. No. 47-5, at 23-28.) A review of these internal documents, however, does not show that a payment was actually made, only that Aurora Loan Services was at some point preparing to make a payment as to a large number of loans. No other documentation has been submitted by Plaintiff in support of its claim, even though such evidence should not be difficult to produce. As noted by James Howard, UAMC's expert with close to 30 years of experience in the mortgage lending industry, who reviewed the documentation produced by LBHI, there is no "direct forensic evidence of such a payment, such as a copy of a check, wire transfer or other exchange of cash that shows exactly what was paid to Freddie Mac, if anything, with respect to the Horstmann Loan. These are records we would expect to be easily produced." (**Ex. 1**, Report, Section VII.B.)

Furthermore, Mr. Baker's deposition testimony casts further doubt as to whether any such payment was made, and, if so, whether it was made on behalf of Plaintiff as opposed to another entity, such as Lehman Brothers Bank ("LBB"). He testified that, among other things, he did not know whether Plaintiff was even aware of any payment when it was allegedly made. (Doc. No. 54-2 at 8, 67:3-9.)

Not only is evidence of payment lacking, but to the extent any payment was made by Aurora Loan Services, it is not at all "undisputed" that such a payment was on behalf of LBHI. To the contrary, there is conflicting evidence as to whether Aurora Loan Services was acting on

behalf of LBB (an affiliated but distinct entity that files its own separate lawsuits of this type) as opposed to LBHI. As the Court notes at page 5, footnote 2, of its Order:

> . . .[D]efendant cites the August 20, 2008 letter regarding alleged loan defects that it received from Aurora Loan Services. Docket No. 47-5 at 29. The letter references an Agreement between LBB and Freddie Mac. See id. ("Pursuant to the Loan Purchase Agreement ("Agreement") between FHLMC and Lehman Brothers Bank, FSB ("Lehman") and the incorporated Seller's Guide, Lehman purchased the above-referenced mortgage loan (the "Loan") from FHLMC.") Defendant also cites a print out from the Mortgage Electronic Registration System ("MERS") obtained by defendant's employee Becky Moore. Docket No. 48-1 at 6, ¶ 14; Docket No. 48-2 at 22-23. The printout indicates that Loan 5128 was transferred from Aurora Bank FSB to Freddie Mac on February 28, 2006.

But the letter noted by the Court, and cited by UAMC as part of its detailed and well-supported statements that it disputed (doc. no. 48 at 17-20, ¶¶5, 9, 11, 15, 29 and 30)[3] this critical aspect of

---

[3] These statements were set forth by UAMC as follows:

> **5.** **Disputed** as to the reference to Aurora Loan Services as "LBHI's administrative agent." Universal sold loans to LBB, not LBHI (Baker Decl., Ex. 1), and received communications from Aurora Loan Services that invariably were expressly sent on behalf of LBB, not LBHI (*see e.g.*, Baker Decl., Exs. 13, 15, 17 and 18).
>
> **9.** **Disputed** that Aurora Loan Services was "LBHI's administrative agent." (See No. 5, above). Also, LBHI, which has the burden of proof, has offered no documentary proof of Aurora Loan Services' supposed general authorization to act on LBHI's behalf, as distinct from LBB's.
>
> **11.** **Disputed**. There is conflicting evidence as to whether LBB ever transferred this loan to LBHI. (Moore Decl., Ex. D; Baker Decl., Ex. 13). Exhibits 5 and 6 to the Baker Declaration shed no light on this subject. Further **disputed** in that the purported assignment (Baker Decl., Ex. 3) contains express carve-outs for, among other things, loans that had never been transferred by LBB to LBHI (*id.*, § 1(c).)
>
> **15.** **Disputed**. LBB (now Aurora Commercial Corp.) and LBHI are distinct companies that indeed sue loan originators separately, often each suing the same company in different lawsuits. Accordingly, the reference to LBB and LBHI maintaining "its" loan tracking data is in error. Disputed also that the records referred to, which are hearsay and have not been properly authenticated in any event, "evidence" such a transfer. They are ambiguous.

Plaintiff's claim, did not simply reference an agreement between LBB (not Plaintiff) and Freddie Mac. The letter also stated clearly that Aurora Loan Services, in demanding payment from UAMC, was acting expressly on behalf of LBB, not on Plaintiff's behalf. (Doc. No. 47-5.)

One can only wonder why, if Aurora Loan Service was supposedly Plaintiff's agent and seeking to recoup money that Plaintiff allegedly had paid to Freddie Mac, its formal demand letter to UAMC would expressly be written on behalf of LBB, not Plaintiff, and call for a payment to LBB, not Plaintiff. Yet Plaintiff has now been granted partial summary judgment with respect to a payment that it is allegedly "undisputed" that it made. Adding to the concern, the "evidence" of that payment consists of an internal "authorization" to pay -- a record that, even if valid and vouched for by an employee with actual direct knowledge of its provenance, would doubtless not even suffice to, for example, prove to a credit card company that an apparently missed payment had in fact been made ("I can't show you a check, but here is an email from my spouse authorizing me to pay our bill"). Respectfully, this is not a record on which an adjudication of liability should have been based.

3. **The Order Identifies All the Elements that Must Be Satisfied to Establish Entitlement to Indemnification, But Plaintiff Has Failed to Make Any Such Showing and the Order Contains No Findings (Nor Any Basis for Findings) That Such Elements Have Been Satisfied**

At page 22 of its Order, the Court recognized that where, as here,

> the "indemnitor [UAMC] had no notice or opportunity to defend, the indemnitee [Plaintiff] must demonstrate 'actual liability' on the underlying claim." [*Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 222-23 (S.D.N.Y. 2010)] (citation omitted); *see also Feuer v. Menkes Feuer, Inc.*, 187 N.Y.S.2d 116, 122 (N.Y.A.D. 1959) ("in order to recover reimbursement," an indemnitee who does notify the indemnitor of the claim "must establish that he would have been

---

29. **Disputed**. The cited exhibits appear to indicate that Aurora was preparing to make a payment, as to a large number of loans.

30. Admitted that a letter was sent on behalf of LBB (not LBHI). The document speaks for itself.

11

liable[,] that there was not [sic] good defense to the liability," and that "the amount paid [] was a reasonable amount").

(Doc. No. 115 at 22.) Plaintiff has never even attempted any such showing in this case. Thus, the Court could not possibly, and indeed did not, make any findings as to whether (1) Plaintiff "would have been [actually] liable;" (2) "there was not [sic] good defense to the liability;" and (3) "the amount paid [] was a reasonable amount."

The unmistakable absence of any such showing by the Plaintiff was, in fact, another basis, independent of the statute of limitations, for granting summary judgment to UAMC -- not Plaintiff. Under no appropriate circumstances can Plaintiff be excused from having to make this required showing under governing law, much less be granted summary judgment as to liability without even attempting to satisfy these requirements under governing law. Nor, as a practical matter, could Plaintiff ever make the required showings under the pertinent factual circumstances. The Court can scour the evidentiary record in vain for any indication that Freddie Mac's allegation of a loan defect (for it was, of course, merely an allegation) was neither defensible, nor avoidable, nor even subject to negotiation. Likewise, Plaintiff cannot legitimately justify its total failure even to bring notice of Freddie Mac's allegation to UAMC's attention until Plaintiff (allegedly) made a payment in response to that allegation. In this respect as well, therefore, Plaintiff was fundamentally ineligible to receive a summary adjudication under governing case law standards.

**4. The Order Overlooks Conflicting Evidence Regarding the Soundness of the Loan**

In its Motion for Summary Judgment, UAMC cited to various comprehensive and far-reaching representations and warranties made by either LBB or Plaintiff to Freddie Mac

approximately two months after UAMC's sale of the loan.[4] (Doc. No. 48 at 4-5.) The purpose of those citations was to show, *inter alia*, that LBB/LBHI itself attested to the high quality of the loan and certified that, after having reviewed the loan file, it had determined that the information was accurate and complete when the loan was sold to Freddie Mac.

All of those attestations are in direct conflict with Plaintiff's claim now that the loan was defective. In other words, there is conflicting historical evidence regarding Plaintiff's own view of, and statements about, the soundness of the loan, and the fact-finder must be permitted to consider these contradictions and inconsistencies. The jury must assess the evidence and weigh the credibility of Plaintiff's current claims of "breach," in juxtaposition to its past claims that the loan was fully compliant. New York courts consistently hold that summary judgment is improper when inconsistencies or contradictions exist between statements made by a party, or when a court must weigh or select from conflicting statements or evidence in order to make a summary adjudication. Some representative cases include:

---

[4] As set forth in UAMC's motion, some of the affirmative representations and warranties made by Plaintiff were as follows:

- That all data and information provided about the loan was true, correct and accurate.
- That it had not misstated or omitted any material fact about the mortgage in selling the mortgage to Freddie Mac.
- That it was fully liable for all representations and warranties even though it had not originated the mortgage.
- That this was an "investment quality" mortgage, specifically meaning that Freddie Mac should have no reason to expect that the borrower would not repay his debt.
- That LBB (or Plaintiff) had determined that the borrower's credit reputation, credit capacity and collateral were all acceptable.
- In fact, LBB (or Plaintiff) was specifically "required," before selling the loan to Freddie Mac, to "document the [b]orrower's credit reputation and [its] determination that the [b]orrower's credit reputation was acceptable"; it was also required to validate that all information on the credit report was accurate and acceptable, and had to document the mortgage payment history of the borrower.

(Doc. No. 48 at 4-5, internal citations omitted.)

13

- *Gilliard v. City of New York*, No. 10-CV-5187 NGG CLP, 2013 WL 521529 (E.D.N.Y. Feb. 11, 2013) ("Simply asserting that a party is lying is insufficient to create a genuine issue of material fact. But where the non-movant can identify facts in the record that cast doubt on a witness's testimony such that the ultimate issue 'turns largely on [that witness's] credibility[,] ... a genuine issue of material fact exists precluding summary judgment.' Put differently, '[t]o the extent that ... inconsistencies [in the record] can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury.'" [internal citations omitted]).

- *Boutsis v. Home Depot*, 371 F. App'x 142, 144 (2d Cir.2010) (reversing grant of summary judgment for the defendant, in part because portions of its employee's testimony were "inconsistent" with respect to a material issue).

- *Adams v. Master Carvers of Jamestown, Ltd.*, 91 F. App'x 718, 724-25 (2d Cir. 2004) (Employer's inconsistent explanations created a genuine issue of material fact with respect to the professed non-discriminatory justification for employee's termination.).

- *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")

- *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").[5]

In short, Plaintiff's conflicting positions themselves preclude a grant of summary judgment, and the Court is not permitted to, in effect, decree that Plaintiff was wrong before and correct now. It is not the province of the Court to resolve conflicting evidence or assess credibility in rendering a decision on summary judgment motions.

For all the foregoing reasons and on the authorities cited, UAMC respectfully requests that the Court reconsider and amend its Order, and enter summary judgment in UAMC's favor.

---

[5] *See also, e.g., Glencore Denrees Paris v. Dep't of Nat. Store Branch 1*, No. 99 CIV. 8607 (RJS), 2008 WL 4298609 (S.D.N.Y. Sept. 19, 2008) (denying defendant's motion for summary judgment due, in part, to contradictions between defendant's prior representations and its affidavits in support of its motion); *Saaverda v. E. Fordham Rd. Real Estate Corp.*, 649 N.Y.S.2d 416 (1996) (affirming the lower court's denial of plaintiff's motion for partial summary judgment due to inconsistencies between his deposition testimony and his own account provided in support of the motion); *Genender v. Nw. Mut. Life Ins. Co.*, No. 01 CIV. 1138 (LLS), 2004 WL 1872289 (S.D.N.Y. Aug. 19, 2004) (denying defendant's motion for summary judgment due to conflicting evidence arising from plaintiff's multiple deposition sessions).

Should the Court decline to grant summary judgment to UAMC, UAMC requests that the Court amend its Order by denying Plaintiff's motion for partial summary judgment.

                                      Respectfully submitted,

By:    */s/Philip R. Stein*
     Philip R. Stein, Esq.
     (Florida Bar No. 67278)
     pstein@bilzin.com
     Enza G. Boderone, Esq.
     (Florida Bar No. 0792411)
     eboderone@bilzin.com
     BILZIN SUMBERG BAENA PRICE
     & AXELROD LLP
     1450 Brickell Avenue, Suite 2300
     Miami, Florida 33131-3456
     Telephone: (305) 374-7580
     Facsimile: (305) 374-7593

     -and-

     Marisa C. Ala, Esq. (#38693)
     PALUMBO BERGSTROM LLP
     8375 South Willow Street, Suite 300
     Lone Tree, CO 80124
     Tel/Fax: (303) 694-0561
     mala@palumbolawyers.com

     *Attorneys for Defendant, Universal American Mortgage Company LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was served on counsel for Lehman Brothers Holdings, Inc. via CM-ECF this 5th day of August, 2014:

    FOSTER GRAHAM MILSTEIN & CALISHER, LLP
    Christopher P. Carrington
    carrington@fostergraham.com
    360 S. Garfield Street, 6th Floor
    Denver, Colorado 80209

                                        /s/Enza G. Boderone
                                        Enza G. Boderone, Esq.